96 A.2d 810 (1953)
CANADA SOUTHERN OILS, Limited,
v.
MANABI EXPLORATION CO., Inc.
Court of Chancery of Delaware, New Castle.
May 15, 1953.
John J. Morris, Jr., Howard L. Williams and Henry Van Der Goes (of Hering, Morris, James & Hitchens), Wilmington, and Coudert Brothers, New York City, for plaintiff.
Richard F. Corroon (of Berl, Potter & Anderson), Wilmington, for defendant.
SEITZ, Chancellor.
This is the decision on plaintiff's application for a preliminary injunction to prevent the issuance, transfer, or voting of certain shares of defendant's stock.
In deciding this matter the court was confronted with a veritable Niagara of words. However, a hard core of uncontradicted facts emerged which I have relied upon in arriving at my determination. Now to those facts.
Plaintiff corporation is engaged directly and through subsidiaries in the business of producing and selling oil, etc. Plaintiff is apparently controlled by what may loosely be called the "Buckley interests". For convenience the terms will often be used interchangeably. About 1950 Cecil V. Hagan, a substantial stockholder in and President of the defendant corporation,[1] sought to interest the Buckleys in acquiring a stock interest in defendant; the defendant's business being the ownership and operation of certain oil producing acreage in Ecuador.
At all times here pertinent defendant's authorized capital stock consisted of 1,500,000 shares. The Buckleys did not buy any of defendant's shares at first but later bought a small number of shares. By subsequent purchases however, they came to own 623,628 shares out of 1,236,600 shares *811 of defendant's outstanding stock. This constituted slightly more than 50%. It appears that plaintiff was required to acquire voting control of defendant as a condition precedent to the floating of plaintiff's convertible debentures by the brokerage house involved.
In 1951 the Buckleys, impressed with Hagan, made him President of plaintiff and gave him a five year contract. In 1952 unsuccessful attempts were made to raise additional capital for defendant. Apparently the Buckleys and Hagan were not in agreement as to the best method of conducting defendant's business. In any event the question of raising additional capital continued to vex defendant's officers and was an important matter for consideration at the time of the annual meeting of defendant's stockholders noticed for May 1952. According to the notice of the May meeting one of the matters to be considered was "the advisability of the issuance of additional shares of Common Stock of the Company." At the meeting the following resolution was proposed by Hagan:
"Resolved, that the Board of Directors is hereby authorized and empowered to issue such additional shares of the Company's presently authorized but unissued Ten Cents (10¢) par value common stock to such persons and at such time and price as the Board of Directors in their sole discretion shall determine to be in the best interests of the Company."
Roy B. Kelly, a director of and attorney for defendant, and the holder of plaintiff's proxy, voted plaintiff's controlling shares for the resolution. The parties are in dispute as to whether the Buckleys were made aware, prior to the meeting, that a public issuance of such shares would result in a waiver of plaintiff's preemptive rights. I find it unnecessary to resolve this point. Immediately after the vote on the resolution a stockholder asked Mr. Kelly whether the resolution amounted to a waiver of preemptive rights. Mr. Kelly expressed the opinion that it did. Thereafter copies of the minutes of the meeting were sent to each of the defendant's seven directors, including John W. Buckley and Heath, both admittedly "representing" the plaintiff's interests. These minutes recited that the question of preemptive rights had been raised and that Mr. Kelly had given an opinion that the approval of the resolution amounted to a waiver. A memorandum attached to the copy of the minutes sent each director requested that any changes be sent within 10 days. Apparently no question concerning the correctness of the minutes or Kelly's opinion was raised by plaintiff or any of the Buckley representatives.
Plaintiff claims that it never relinquished its preemptive rights and that subsequent action by defendant in treating plaintiff's action as a waiver of its preemptive rights was not justified. Defendant argues that while plaintiff did have a preemptive right in such shares, it waived such right by voting for the quoted resolution or, in any event, by failing to object after receiving notice that the defendant considered that the voting of plaintiff's shares in favor of the resolution constituted a waiver.
I fully agree that whether it be characterized as a waiver or an estoppel plaintiff is precluded from contending that it did not give up its preemptive rights in the authorized but unissued shares of the defendant's stock under the circumstances just narrated. In addition, plaintiff was the majority stockholder and was aware that the shares were to be used for a public issuance. Plaintiff has raised certain other questions concerning the validity of the notice of meeting, the form of the resolution and the authority of its proxy to so vote, but I find no merit to any of these contentions.
After the passage of the resolution and the subsequent unsuccessful attempts to dispose of the shares by public distribution, the matter of the disposition of such shares apparently was subordinated in favor of other possible methods of raising capital for defendant.
At the same time other events of significance were taking place. As time went on the Buckley interests became dissatisfied *812 with Hagan's handling of plaintiff's affairs. Without attempting to fix blame, it appears that the Buckley interests came to feel that Hagan was not paying sufficient attention to the affairs of plaintiff corporation and was too much interested in developing defendant. The relationship between the Buckley interests and Hagan deteriorated rapidly so that by early 1953 Hagan was requested to take a leave of absence from his affairs as President of plaintiff corporation. However, Hagan resigned as President on February 26, 1953 and at or about this time sold the balance of his substantial stock holdings in plaintiff. He continued as President of defendant corporation and there is no doubt that the majority of the Board were "Hagan men".
Paralleling these events, it appears that defendant's finances were adversely affected in 1952 by declining production but even more by the substantial expense of building a gasoline plant. Attempts to raise money for defendant in late 1952 and early 1953 were unsuccessful. Early in 1953 defendant's need for immediate operating cash became more pressing. Negotiations between Hagan and Buckley with a view to raising some money for defendant were indecisive. In his deposition Hagan admits that prior to the crucial directors' meeting of March 27, 1953 he did not ask Buckley for a firm decision on the question of a loan or other method of meeting the defendant's current financial problems. He explains this failure by saying that he had asked for a short term cash loan of $35,000 and Buckley had suggested that he and Hagan each advance one half of it. Apparently this suggestion exasperated Hagan because he says he himself then advanced $25,000 to the defendant.
We come down to Monday, March 23, 1953 when, at Hagan's direction, the directors received notice by telegram that a meeting of the Board would be held in Houston, Texas on Friday, March 27 to consider defendant's financial condition. Both Buckley and Heath who were directors closely associated with the controlling Buckley interests received their telegrams in New York. They objected to the holding of the meeting on such short notice and proposed a few days postponement and a change of the meeting place to Washington. This was refused and the other five directors, consisting of Hagan, Kelly and three others who had been placed on the Board originally at Hagan's suggestion, proceeded to hold the directors' meeting.
At that time, pursuant to the authority appearing in the resolution passed in May 1952, they approved the sale of the 226,950 unissued shares of defendant's stock to Crockett & Company of Houston, Texas. It is not disputed that Hagan began negotiations for the sale of the bulk of these shares to the Murchison and Ohrstrom interests at least by Monday, March 23. Crockett & Company was brought into the picture as a "go-between". They admittedly took 200,000 shares for the Murchison and Ohrstrom interests and purchased the remaining 26,950 shares for themselves. The sale was promptly consummated. However, except for 50,000 shares which were sold outright, certificates for the balance were held by defendant to secure the remainder of the purchase price due on such shares.
Plaintiff claims that the 226,950 shares were sold by defendant for an improper purpose, namely, to deprive plaintiff of clear voting control and to give it to Hagan and his associates. Plaintiff suggests that a conspiracy working toward that end existed for many months prior to the directors' meeting. Since this is an application for a preliminary injunction, I pass by the theory of a conspiracy extending back over a period of months because the record would raise a serious question as to the merits of that charge. I prefer to consider the situation at or about the date the shares were sold.
In reply to plaintiff's charge that Hagan and his associates caused the shares to be issued for an improper purpose, defendant says that the shares were sold to raise money to meet defendant's dire financial plight and the fact that by so selling plaintiff lost its majority voting control is not an actionable consequence. The defendant concedes that if the primary purpose *813 of the sale was to deprive plaintiff of its voting position then the action was improper. As I see it, that is the crucial issue here.
It is obvious, and Hagan admitted that he knew that plaintiff desired to retain the majority voting control of defendant. In fact it appears that plaintiff, to Hagan's knowledge, had to obtain such control in order to have certain convertible debentures floated. Whether plaintiff was required to retain such control it is unnecessary to consider. Hagan's position as President of plaintiff until February 1953 made him well aware of plaintiff's needs and desires.
Certain undisputed facts and reasonable inferences surrounding the sale of these shares are significant to my decision:
1. The shares were not offered to the plaintiff or to the Buckley interests at the time of this so-called financial crisis.
2. Hagan apparently gave the Buckley interests no opportunity to make a final decision as to what they would do in connection with defendant's pressing need for operating capital. He preferred to assume that they would not help.
3. No reference was made in the notice of the directors' meeting to the possibility of selling such shares even though it is a fair inference that Hagan was negotiating their sale at or prior to the date such notice was sent.
4. The nominal purchaser Crockett & Company charged no commission on the transaction and the business was "thrown" their way by Mr. Hagan's close friend.
5. It is not unreasonable to infer that proxies in Hagan's favor to vote all of the shares sold were apparently arranged for at or about the time of the sale and the purchasers were then aware that plaintiff was the majority stockholder and that this sale would adversely affect plaintiff's position.
6. Kelly and Hagan's three friends on the Board "went along" with Hagan on the plan fully conscious of its consequences on plaintiff's control.
7. Defendant's President, Hagan, had resigned as plaintiff's President only a few weeks before under obviously unpleasant circumstances.
8. Hagan, almost immediately after the sale, advised a member of plaintiff's brokerage firm by long distance call that plaintiff had lost control of defendant. Hagan's explanation for this call is completely unconvincing. It is some evidence that his real intention was to gain control of defendant. It also demonstrates that he was so vindictive that he hoped this information would adversely affect plaintiff's outstanding convertible debentures.
It is obvious that the only real justification for the issuance of these shares in the way they were issued is that defendant's financial condition required such action and even then I am doubtful whether it was here justified without first giving plaintiff an opportunity to purchase such shares. While defendant was obviously in need of current operating funds I am not persuaded that its long range financial prospects were as bad as defendant sought to represent them. While some of the decrease in income was due to a decline in production a great deal of embarrassment came from the fact that the funds were used in 1952 to erect a gasoline plant. However, the long range prospects were far from the bankruptcy which Hagan talks about. Certainly the Buckley interests were apparently negligent in their responsibility to this defendant but that did not justify Hagan's action, particularly in view of his previous fiduciary connection with plaintiff.
When the undisputed facts are viewed cumulatively I find it reasonable to infer that the primary purpose behind the sale of these shares was to deprive plaintiff of the majority voting control. Hagan and his associates did too much too soon with too little disclosure to justify a contrary conclusion.
Defendant suggests that it does not appear that Hagan and his associates will be able to obtain voting control even with the shares in question because there are *814 several "independent" stockholders Assuming this to be so, which I doubt, it nevertheless seems to me that majority voting control is a right which a court of equity will protect under these circumstances. No question of "joinder" was raised in sufficient time to fairly call for its consideration in disposing of the present application.
Since I have determined that the undisputed facts show a reasonable probability of ultimate success on plaintiff's part and since I believe the law action pending in Texas for money damages does not provide this plaintiff with an adequate remedy, it follows that a preliminary injunction should issue.
Order on notice.
NOTES
[1] Defendant was formerly a Texas corporation but became a Delaware corporation. Other corporate changes involving plaintiff and defendant took place but they are not here important.