IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARION COSTER, | § | |
| | § | No. 49, 2020 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below – Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | Consolidated |
| UIP COMPANIES, INC., STEVEN | § | C.A. No. 2018-0440 |
| SCHWAT, and SCHWAT REALTY | § | |
| LLC, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: April 7, 2021
Decided: June 28, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED.**

Max B. Walton, Esquire (*argued*), Kyle Evans Gay, Esquire, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Michael K. Ross, Esquire, Thomas Shakow, Esquire, Serine Consolino, Esquire, Sean Roberts, Esquire, AEGIS LAW GROUP LLP, Washington, D.C.; *Attorneys for Plaintiff-Appellant Marion Coster*.

Stephen B. Brauerman, Esquire, Elizabeth A. Powers, Esquire, BAYARD, P.A., Wilmington, Delaware; Deborah B. Baum, Esquire (*argued*), PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C.; *Attorneys for Defendants-Appellees UIP Companies, Inc., Steven Schwat, and Schwat Realty, LLC*.

**SEITZ**, Chief Justice:

The two equal stockholders of UIP Companies, Inc. were deadlocked and could not elect new directors. One of the stockholders, Marion Coster, filed suit in the Court of Chancery and requested appointment of a custodian for UIP under 8 *Del*. *C*. § 226(a)(1) (the "Custodian Action"). In response, the three-person UIP board of directors—composed of the other equal stockholder and board chairman, Steven Schwat, and the two other directors aligned with him—voted to issue a one-third interest in UIP stock to their fellow director, Peter Bonnell, who is also a friend of Schwat and long-time UIP employee (the "Stock Sale"). It is not seriously disputed that the defendants issued the stock to Bonnell to dilute Coster's UIP ownership interest below 50%, block her attempts to elect directors, and avoid a possible court-appointed custodian.

Coster filed a second action in the Court of Chancery, claiming that the board breached its fiduciary duties by approving the Stock Sale. She asked the court to cancel the Stock Sale. After consolidating the two actions, the Court of Chancery found what was apparent given the timing of the Stock Sale—the conflicted UIP board issued stock to Bonnell to dilute Coster's UIP interest below 50%, break the stockholder deadlock for electing directors, and end the Custodian Action. Ultimately, however, the court decided not to cancel the Stock Sale. According to the court, the UIP board approved the Stock Sale at a fair price and set that price through a fair process. It declined to consider any other aspects of the transaction,

2

reasoning that it was unnecessary to review the Stock Sale under any less rigorous standard of review if the stock issuance passed the most rigorous entire fairness review. Having satisfied entire fairness, the court held that the board did not breach any fiduciary duty owed to Coster.

In this decision, we reverse the Court of Chancery on the conclusive effect of its entire fairness review and remand for the court to consider the board's motivations and purpose for the Stock Sale. In a vacuum, it might be that the price at which the board agreed to sell the one-third UIP equity interest to Bonnell was entirely fair, as was the process to set the price for the stock. But "inequitable action does not become permissible simply because it is legally possible."[1] If the board approved the Stock Sale for inequitable reasons, the Court of Chancery should have cancelled the Stock Sale.[2] And if the board, acting in good faith, approved the Stock Sale for the "primary purpose of thwarting" Coster's vote to elect directors or reduce her leverage as an equal stockholder, it must "demonstrat[e] a compelling justification for such action" to withstand judicial scrutiny.[3]

After remand, if the court decides that the board acted for inequitable purposes or in good faith but for the primary purpose of disenfranchisement without a

---

[1] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).
[2] *Id.*
[3] *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 661–62 (Del. Ch. 1988).

3

compelling justification, it should cancel the Stock Sale and decide whether a custodian should be appointed for UIP.

I.

A.

We rely on the facts as found at trial.[4] Wout Coster,[5] Cornelius Bruggen, and Schwat formed UIP Companies, Inc. ("UIP" or the "Company") in 2007. UIP is a Delaware real estate investment services company composed of three subsidiaries: UIP Asset Management, Inc., UIP General Contracting, Inc., and UIP Property Management, Inc. Part of UIP's business involves the principals and third-party equity sponsors investing their own capital into the real estate investments of special purpose entities ("SPEs").[6] SPEs are high-risk, high-reward investments that sometimes require prolonged tie-ups of capital and UIP's principals' personal guarantees to lenders. To mitigate risk, UIP's principals created UIP and its subsidiaries to control management and develop SPE properties. During trial, the Court of Chancery heard expert testimony that "[t]he reality behind [UIP's structure] is if for some reason [the principals] stopped providing opportunities, the three

---

[4] Unless otherwise stated, facts are drawn from the Court of Chancery's January 28, 2020 opinion, *Coster v. UIP Cos., Inc.*, 2020 WL 429906 (Del. Ch. Jan. 28, 2020).

[5] This decision refers to Mr. Coster as "Wout" and Marion Coster as "Coster" to avoid name confusion.

[6] SPEs are sometimes referred to a "promotes."

4

operating companies down below would ultimately run out of business and actually not be able to continue."[7]

At formation, Wout, Bruggen, and Schwat each received one-third of the stock. Bruggen ultimately left UIP and tendered his stock to UIP, leaving Wout and Schwat each with a one-half interest in UIP. UIP had a five-member board of directors composed of Wout, Bruggen, and Schwat plus two UIP employees, Bonnell and Stephen Cox. Bonnell, under the tutelage of UIP's principals, rose through UIP's ranks to become the principal of UIP Asset Management. Cox also rose through the ranks to become chief financial officer at UIP Asset Management.

In late 2013, Wout told the other UIP principals that he had been diagnosed with leukemia. The UIP principals began succession planning, which included de-equitizing Wout. By early 2014, Wout began negotiations with Schwat for a buyout of his UIP stake by Bonnell and Heath Wilkinson, then-president of UIP General Contracting.[8] Emails at the time show that Schwat expressed concerns about a lack of liquidity to repurchase Wout's stock. Schwat was also concerned that the operating companies were only valuable to UIP executives, such as Bonnell and Wilkinson.

---

[7] *Coster*, 2020 WL 429906, at *2 (second alteration in original).
[8] Around the time of Wout's diagnosis, Wilkinson threatened to leave UIP.

On April 11, 2014, Wout, Schwat, Bonnell, and Wilkinson signed a term sheet (the "Term Sheet") whereby Wout would wind down his role at UIP with a decreased salary. The Term Sheet valued UIP at $4,250,000. The Term Sheet memorialized a gradual transfer of Wout's one-half interest in UIP and portions of Wout's promote interests to Bonnell and Wilkinson in exchange for a $2.125 million note. Schwat would also transfer part of his UIP and promote interests for the same amount. Further, the Term Sheet provided that Wout's wife, Marion Coster—the plaintiff— would receive lifetime health insurance and an undetermined future salary. Ultimately, however, the parties abandoned the Term Sheet. Though negotiations continued and the parties exchanged revisions, the parties never reached an agreement.[9]

Wout passed away on April 8, 2015. Coster inherited ownership of Wout's UIP stock and certain promote entities. Buyout discussions resumed in June 2015 but did not lead to an agreement. In December 2015, Coster sought assistance from Michael Pace—a retired attorney and friend of Coster.[10] Pace sent an email to Robert Gottlieb, Wout's personal legal counsel, explaining that Coster was "very distressed about her financial situation and now must sell her home."[11] In early 2016,

---

[9] During subsequent negotiations, "the parties all agreed that [the $4.25 million] figure was 'way too high' given an estimated $2 million book value of the operating companies." *Coster*, 2020 WL 429906, at *4 (quoting the record).

[10] Pace's wife, Anne, was the executor of Wout's estate.

[11] *Coster*, 2020 WL 429906, at *6 (quoting the record).

6

Gottlieb met with Bonnell and Schwat to negotiate and try to understand the terms of buying out Coster's stake in the Company. In March 2016, Schwat emailed Coster directly to convince her to accept his terms. By May, Coster appeared primarily interested in a lump-sum buyout or arrangement that would provide her with a consistent stream of income, but negotiations stalled again.

At the suggestion of Pace, Coster and Anne Pace—Pace's wife—met separately with Bonnell in July 2016. More meetings occurred in September and October. The meetings were "very cordial discussions" and, according to Pace, Bonnell was interested in a resolution agreeable to all.[12] During the July meeting, Bonnell identified three avenues for the buyout, which Pace forwarded to Michael Rinaldi—UIP's previous in-house accountant who had at that time left UIP and served Coster in his individual capacity. Rinaldi told Pace to "push for accounting records on [the operating] companies and exercise all rights as a shareholder."[13] Pace then requested from Bonnell information on the operating companies' profitability. Bonnell replied that the companies were operating "close to even" without "much positive revenue generated" since Wout's passing.[14] Pace was skeptical whether this reflected the operating companies' profitability.

---

[12] *Id.* (quoting the record).
[13] *Id.* (alteration in original) (quoting the record).
[14] *Id.* (quoting the record).

In September 2016, Coster met with Bonnell and Pace.[15] Bonnell offered to buy Coster's UIP interest while Coster would retain her interest in the promotes. Thereafter, Coster asked Rinaldi to estimate UIP's value. Rinaldi thought that a reasonable starting point was the $2.125 million from the Term Sheet, though the Term Sheet included promote interests. Coster then requested that Rinaldi perform a valuation of UIP. Rinaldi engaged Iver Scott to do so.[16] While the valuation was under way, Bonnell and Coster continued to negotiate. In March 2017, Bonnell shared financial data with Coster and tried to persuade her to take the original deal from the Term Sheet. On June 9, 2017, Coster wrote that she would be willing to sell her UIP interest for the valuation price reached by Scott.

Scott finalized his valuation in June 2017. Coster's counsel sent a letter to Schwat, Bonnell, and Wilkinson enclosing the Scott valuation. In August 2017, Coster sent a letter with the Scott valuation attached and demanded to inspect UIP's books and records. After much back and forth about the adequacy of the documents provided, on April 4, 2018, Coster called for a UIP stockholders special meeting to elect new board members. UIP's bylaws permit special meetings of stockholders "for any purpose or purposes" upon the written request of stockholders comprising

---

[15] "Discussions paused while Bonnell was on vacation in August 2016." *Id.* at *7.
[16] *See* App. to Opening Br. at A442 (Trial Tr. 146) ("Q. And why did you hire Mr. Scott to provide a calculation of value? [Coster]: Because there was constantly mention of there was no money in the business.").

more than 25% of the Company's voting stock.[17]  UIP had not held an election of directors or annual stockholder meeting since 2007.  The stockholders never filled the board seats previously held by Bruggen and Wout.  Thus, those seats were open.  UIP issued a notice of special meeting of stockholders "t[o] vote on the election of directors of the Corporation."[18]

On May 22, 2018, the two stockholders and their representatives gathered for the meeting.  Thomas Shakow, Coster's counsel, represented her by proxy.  Serine Consolino, another attorney from the same law firm as Shakow, also attended for Coster.  Schwat attended as the representative of Schwat Realty, LLC, through which Schwat holds UIP stock.  Jeffrey B. Grill, an attorney, attended as counsel to UIP and served as secretary and inspector of elections.  Shakow raised three motions on Coster's behalf at the meeting.  First, Coster moved to reduce board seats from five to four.  Schwat voted against the motion guaranteeing its failure.  Next, Coster moved to fill the seats formerly held by Bruggen and Wout with two of Coster's designees.  This likewise failed.  Third, Coster raised a motion to vote on the entire five-member board, nominating Coster, Schwat, Bonnell, and Coster's two designees.  Schwat adjourned the meeting prior to considering the third motion because "correspondence from [Coster's law firm] suggested two proposals to be

---

[17] *Coster*, 2020 WL 429906, at *8.
[18] *Id*. (alteration in original).

taken at the special meeting."[19] Schwat "noted that the Company would be happy to consider a request for another special meeting."[20] That same day, Coster called another special meeting to vote on the holdover director seats. UIP agreed to the meeting, but informed Coster's attorneys that the board had reduced the number of board seats to three through unanimous written consent.

The two stockholders convened another meeting on June 4, 2018. Shakow, Consolino, and Schwat again attended as representatives for the two UIP stockholders. Grill served as secretary and inspector of elections. Schwat first proposed approval of the elections of Schwat, Bonnell, and Cox to serve as directors until UIP's next annual meeting or until their successors are duly elected and qualified. Coster voted against this proposal by proxy, so it failed. Shakow then proposed a vote to increase the board to five seats, electing Coster, Schwat, Bonnell, and Coster's two designees to serve as directors until UIP's next annual meeting or until their successors are duly elected and qualified. Schwat opposed, so it failed. Third, Shakow proposed approval of Schwat and Coster's two designees to serve as directors until UIP's next annual meeting or until their successors are duly elected and qualified. Schwat again opposed and the proposal failed. Leaving the June 4, 2018 stockholder meeting, Schwat, Bonnell, and Cox remained holdover directors.

---

[19] *Id*. at *9 (quoting the record).
[20] *Id*. (quoting the record).

Coster filed this litigation on June 15, 2018 as a statutory proceeding under 8 *Del. C.* § 226(a)(1)[21] to appoint a custodian to break the stockholder deadlock. The complaint "mainly sought to impose a neutral tie-breaker to facilitate director elections," and alleged that Schwat "prevented Mrs. Coster from gaining a meaningful view into the Company's financial affairs."[22] The defendants obtained an extension to respond to the complaint until July 27, 2018.

On July 16, 2018, the defendants hired Andy Smith of McLean Group LLC to value UIP. The defendants pushed Smith to prepare the valuation prior to the July 27 extended deadline for responding to Coster's complaint.[23] Then, on advice of counsel, the defendants changed course and decided to answer the complaint while they worked on the Stock Sale. The defendants answered the complaint on July 27, 2018, opposing appointment of a custodian.

On July 27, 2018, McLean provided the board with its preliminary valuation of UIP. Having filed the answer to the Custodian Action complaint with an intent to amend, Schwat informed McLean via email "not to hurry the project 'in any way,' even if it meant taking additional time to arrive at 'the value [they] think is truly

---

[21] The statute permits the Court of Chancery to "appoint 1 or more persons to be custodians" where, among other situations, "(1) [a]t any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors[.]" 8 *Del. C.* § 226(a)(1).

[22] *Coster*, 2020 WL 429906, at *10.

[23] Schwat emphasized that he was "in a rush for the valuation" in a July 25, 2018 email to McLean. *Id*.

fair.'"[24]  Schwat "then further suggested adding additional commentary to the report that could justify a lower valuation."[25]  McLean issued its final valuation (the "McLean Valuation") on August 14, 2018.  The McLean Valuation valued a 100-percent, noncontrolling equity interest in UIP at $123,869.

On the same day, Schwat forwarded the McLean Valuation to Bonnell and offered to sell him one-third of UIP's authorized—but unissued—stock at one-third the value of the McLean Valuation.  Bonnell accepted.  On August 15, 2018, the board, by unanimous written consent, sold the one-third interest to Bonnell Realty LLC for $41,289.67.  On August 15, 2018, equipped with Bonnell's one-third interest in UIP, the defendants filed an amended answer in the Custodian Action and stated an intention to move for judgment on the pleadings because the Custodian Action was moot.  On August 22, 2018, the plaintiff filed a second action, individually and on behalf of UIP, to cancel the Stock Sale and to impose a constructive trust.  Coster alleged that the dilutive Stock Sale interfered with her voting rights and impeded her statutory right to seek court appointment of a custodian.  The parties stipulated to consolidation of the two actions, and the Court of Chancery held a trial in April 2019.

---

[24] *Id.* at *11 (alteration in original).
[25] *Id.*

B.

Before its substantive analysis, the Court of Chancery made factual findings relevant to this appeal. The court found that the defendants "obviously desired to eliminate [Coster]'s ability to block stockholder action, including the election of directors, and the leverage that accompanied those rights."[26] The court also found that the timing of the Stock Sale and the defendants' amended answer in the Custodian Action "make clear that the Stock Sale was significantly motivated by a desire to moot the Custodian Action."[27] Further, the court found that Schwat and Bonnell were interested in the transaction.[28] The court tempered its findings, however, by noting that the defendants were also concerned about the effects a custodian appointment might have on UIP. According to the court, the board felt that court appointment of a custodian might trigger UIP's default under its SPE contracts. And the court found that the stock issued to Bonnell was meant to fulfill a longstanding commitment to give a valuable employee an equity interest.

The court set aside these factual findings, however, and reviewed the Stock Sale under an entire fairness standard of review.[29] In the court's view, if the Stock Sale passed entire fairness review, the board's motives were "beside the point."[30]

---

[26] *Id.* at *12.
[27] *Id.* ("Defendants effectively admitted this much in post-trial briefing.").
[28] *Id.* at *15–17.
[29] *Id.* at *14–15.
[30] *Id.* at *13.

13

Looking first at whether entire fairness was the right standard of review, the Court of Chancery concluded that Bonnell and Schwat—a majority of the board—were interested in the transaction. Bonnell conceded interestedness "because he received a benefit as the recipient of the stock that was approved."[31] Schwat viewed the Custodian Action as "invasive" and "wished to avoid" the prospect of a custodian.[32] Moreover, the court noted Schwat and Bonnell's friendship and that "from the inception of Wout's transition planning negotiation, Schwat and Bonnell appeared to be aligned in negotiations against Wout."[33] Schwat and Bonnell "worked together to develop the plan to moot the Custodian Action and neutralize the threat of [Coster] controlling the Company."[34] Thus, the court concluded that Schwat was interested in the Stock Sale because the Stock Sale placed stock in friendly hands to "quash[] any risk, however minimal, of th[e] Court [of Chancery] ordering the expansive relief [Coster] sought in the Custodian Action and mitigated any pressure from [Coster] at the Board level."[35] Having found a majority of the board interested in the Stock Sale, the court held that the defendants had to prove that the Stock Sale was entirely fair to Coster.

---

[31] *Id.* at *15.
[32] *Id.* at *16.
[33] *Id.*
[34] *Id.*
[35] *Id.* at *17.

The court found that, although the process behind the Stock Sale "was by no means optimal,"[36] the McLean Valuation and Smith's testimony were credible, which led the court to conclude that the price had been set after a fair process. The court also found the lack of a board meeting did not taint the process because "[i]t is doubtful that a meeting of a majority of conflicted directors would have cured any defects in the process."[37] As to fair price, the court similarly found that the McLean Valuation was the most reliable indicator of UIP's fair value, satisfying entire fairness review. Having decided that the price of the Stock Sale was entirely fair, the Court of Chancery held that the present stockholders of UIP were no longer deadlocked, declined to appoint a custodian, and dismissed the action.

## II.

Coster argues on appeal that the Court of Chancery erred when it found that the UIP board did not breach its fiduciary duty to Coster by approving the Stock Sale. According to Coster, the court erred by limiting its inquiry to entire fairness. Instead, the court should have reviewed not just the fairness of the price and process to reach that price, but also the context in which the Stock Sale occurred—a conflicted board approved the Stock Sale to defeat Coster's voting rights and the leverage that came from the exercise of those rights, entrench the existing board, and

---

[36] *Id.* at *20.
[37] *Id.* at *18.

interfere with her statutory right to petition for court appointment of a custodian. As Coster claims, in the context of stalled buyout negotiations, a contested director election and request to appoint a custodian, even though the board had the legal authority to issue UIP stock, the board could not act inequitably by approving the Stock Sale in order to dilute her ownership interest, defeat her voting and statutory rights, and entrench themselves in office. And even if the board had innocent reasons for the Stock Sale, it is undisputed that the Stock Sale interfered with Coster's statutory and voting rights. Under these conditions, the board had to prove that it had a compelling justification for the stock issuance, which it failed to do.

The defendants respond that entire fairness review was the appropriate lens to review the Stock Sale because, as the court held, it is the most rigorous standard of review of board action. If the Stock Sale met this standard, the board could not breach its fiduciary duty to Coster under a less rigorous standard of review. They also contend that, even if the Stock Sale interfered with Coster's voting and statutory rights, the board had compelling reasons to do so. The directors needed to head off a possible default if the court appointed a custodian, and the board was simply following through on a long-standing promise to reward Bonnell for his service to UIP and retain him as a key UIP employee.

16

Whether the Court of Chancery applied the correct standard of review is a question of law we review *de novo*.[38]  We review the Court of Chancery's factual findings for clear error.[39]

A.

Even though Coster attacks the court's entire fairness analysis, the Court of Chancery fully supported its factual findings and legal conclusion that the board sold UIP stock to Bonnell at a price and through a process that was entirely fair.  Thus, we will not disturb this aspect of the court's decision.  But the court also held that its entire fairness analysis was the end of the road for judicial review.  In the court's words, "[b]ecause the Stock Sale satisfies Delaware's most onerous standard of review, this decision does not reach Plaintiff's alternative arguments."[40]

In our view, the court bypassed a different and necessary judicial review where, as here, an interested board issues stock to interfere with corporate democracy and that stock issuance entrenches the existing board.  As explained below, the court should have considered Coster's alternative arguments that the board approved the Stock Sale for inequitable reasons, or in good faith but for the

---

[38] *GXP Capital, LLC v. Argonaut Mfg. Servs., Inc.*, --- A.3d ----, 2021 WL 2010348, at \*2 (Del. May 20, 2021).
[39] *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi., Ill.*, 75 A.3d 101, 109 (Del. 2013).
[40] *Coster*, 2020 WL 429906, at \*14.

primary purpose of interfering with Coster's voting rights and leverage as an equal stockholder without a compelling reason to do so.

As early as *Schnell v. Chris-Craft Industries*, *Inc.*, we recognized that a board of directors could not escape judicial review of its actions by pointing to the legal authorization to undertake a given act.[41] In *Schnell*, the incumbent board took admittedly legal action to move up the annual meeting date and change the location from New York City to a remote destination. These moves prevented a dissident slate from waging an effective election campaign. We held that the board's purposeful manipulation of the election machinery to entrench themselves violated the board's duty to act equitably toward stockholders. In a recent decision, we captured the essence of *Schnell* and the twice-tested judicial review of director action affecting the stockholder franchise:

> This Court has long recognized that "inequitable action does not become permissible simply because it is legally possible." Under Delaware law, "director action[s] [are] 'twice-tested,' first for legal authorization, and second [for] equity." "Stockholders can entrust directors with broad legal authority precisely because they know that that authority must be exercised consistently with *equitable* principles of fiduciary duty."[42]

---

[41] 285 A.2d at 439.

[42] *Bäcker v. Palisades Growth Capital II*, *L.P.*, 246 A.3d 81, 96–97 (Del. 2021) (alteration in original) (emphasis in original) (first quoting *Schnell*, 285 A.2d at 439; then quoting *In re Invs. Bancorp.*, *Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017); and then quoting *Sample v. Morgan*, 914 A.2d 647, 664 (Del. Ch. 2007)).

Delaware law recognizes that the stockholder franchise is the "'ideological underpinning' upon which the legitimacy of the directors managerial power rests."[43] Keeping "a proper balance in the allocation of power between the stockholders' right to elect directors and the board of directors' right to manage the corporation is dependent upon the stockholders' unimpeded right to vote effectively in an election of directors."[44] "Accordingly, careful judicial scrutiny will be given [to] a situation in which the right to vote for the election of successor directors has been effectively frustrated and denied . . . ."[45]

Delaware courts "have remained assiduous in carefully reviewing any board actions designed to interfere with or impede the effective exercise of corporate democracy by shareholders, especially in an election of directors."[46] We have been clear that "where boards of directors deliberately employ[] various legal strategies

---

[43] *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1126 (Del. 2003) (citation omitted); *see also EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012) ("Shareholder voting rights are sacrosanct.  The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm.  Without that right, a shareholder would more closely resemble a creditor than an owner.").

[44] *Liquid Audio*, 813 A.2d at 1127.

[45] *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 239–40 (Del. 1982) (finding an abuse of discretion where the court did not appoint a custodian because the company was in a perpetual deadlock that entrenched existing directors, and it was "admitted by counsel for the defendants that their primary purpose in perpetuating their control of the board of directors [was] to give the defendants the governing hand in forthcoming executive compensation contract negotiations with their 50–50 partners, the plaintiffs").

[46] *Liquid Audio*, 813 A.2d at 1127.

either to frustrate or completely disenfranchise a shareholder vote. . . . [t]here can be no dispute that such conduct violates Delaware law."[47]

For instance, in *Condec Corp. v. Lunkenheimer Co.*,[48] the Court of Chancery cancelled a hastily put together stock issuance where the "primary purpose" was to thwart a majority stockholder's control.[49] The court emphasized the need to protect the stockholder's franchise:

> the transaction here attacked . . . was clearly unwarranted because it unjustifiably strikes at the very heart of corporate representation by causing a stockholder with an equitable right to a majority of corporate stock to have his right to a proportionate voice and influence in corporate affairs to be diminished by the simple act of an exchange of stock which brought no money into the Lunkenheimer treasury . . . and which was obviously designed for the primary purpose of reducing Condec's stock holdings in Lunkenheimer below a majority.[50]

In *Canada Southern Oils, Ltd. v. Manabi Exploration Co., Inc.*[51] even though the corporation was in "dire financial plight," the court considered the circumstances surrounding the stock issuance and held that "the primary purpose behind the sale of these shares was to deprive plaintiff of the majority voting control" and enjoined the transaction.[52] And in *Packer v. Yampol*,[53] the court enjoined a preferred stock

---

[47] *Stroud v. Grace*, 606 A.2d 75, 91 (Del. 1992).
[48] 230 A.2d 769 (Del. Ch. 1967).
[49] *Id.* at 777.
[50] *Id.*
[51] 96 A.2d 810 (Del. Ch. 1953).
[52] *Id.* at 812–14.
[53] 1986 WL 4748 (Del. Ch. Apr. 18, 1986).

issuance meant to defeat a proxy contest.[54] Although the company needed to raise capital, and raising capital might have been one purpose for issuing stock, "their primary purpose was to obstruct plaintiffs' ability to wage a meaningful proxy contest in order to maintain themselves in control."[55]

Chancellor Allen summarized the import of these cases in *Glazer v. Zapata Corp.*:

> These cases stand for the proposition that directors may not act to frustrate the efforts of stockholders to elect new directors by engaging in transactions that are designed and pursued for the primary purpose of diluting the votes held by the insurgent stockholders. As such they are articulations of the principle which was old and well established when articulated in *Schnell v. Chris–Craft Industries*, . . . that "the subversion of corporate democracy by manipulation of corporate machinery will not be countenanced under Delaware law."[56]

---

[54] *Id.* at *18.

[55] *Id.* at *15.

[56] 658 A.2d 176, 186 (Del. Ch. 1993) (quoting *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1080 (Del. Ch. 1985), *aff'd*, 500 A.2d 1346 (Del. 1985)); *see Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 82 (Del. Ch. 2008) (ordering new special meeting presided over by a special master for director elections where the incumbents "tainted the election"); *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *15 (Del. Ch. Dec. 4, 2000) (expressing doubt that the defendants could provide a "compelling justification" for meeting adjournment done for "the primary purpose of interfering with the shareholder vote"); *WNH Invs., LLC v. Batzel*, 1995 WL 262248, at *6–7 (Del. Ch. Apr. 28, 1995) (granting relief from dilutive stock issuance designed to thwart challenges to board control); *Commonwealth Assocs. v. Providence Health Care, Inc.*, 1993 WL 432779, at *7–9 (Del. Ch. Oct. 22, 1993) (enjoining stock issued into friendly hands in order to block stockholders' consent rights from being counted as valid for voting and right to consent purposes); *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208–1209 (Del. Ch. 1987) (enjoining further postponement of annual meeting by incumbent directors who postponed the meeting "upon learning that they might be turned out of office"); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906, 914 (Del. Ch. 1980) (invalidating bylaw provisions that permitted the board to "prevent the plaintiff and his group from placing the names of their candidates in nomination"); *Canada S. Oils*, 96 A.2d at 814 (enjoining stock issuance that would dilute a 51% shareholder where the stock was issued for the primary purpose of depriving the plaintiff of voting power.); *see also Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *9 (Del. Ch. Oct. 16, 1987) ("I take it to be established in our law that it would ordinarily be found to constitute an abuse of power for a board

The Court of Chancery in *Blasius Industries, Inc. v. Atlas Corp.*[57] held that, even though *Schnell* did not apply when the board acts in good faith, if the board nonetheless acts for the primary purpose of impeding stockholders' franchise rights, the board must prove a "compelling justification" for its actions. Our Court approved of the *Blasius* standard of review in *MM Cos., Inc. v. Liquid Audio, Inc.*[58] In *Liquid Audio*, we held that when directors are faced with a threat to corporate control and act with the primary purpose to thwart the stockholders' franchise rights, the *Blasius* "compelling justification" test must be met before the Court will apply the reasonableness and proportionality test of *Unocal Corp. v. Mesa Petroleum Co.*[59] to the board's defensive actions. We also explained in *Liquid Audio* that the board's actions "need not actually prevent the shareholders from attaining any success in seating one or more nominees in a contested election for directors and the election contest need not involve a challenge for outright control of the board of directors."[60] Rather, to invoke *Blasius* the challenged board action "only need[s] to be taken for

---

of directors to issue stock, not for the principal purpose of raising necessary or desirable capital, but for the sole or primary purpose of diluting the voting power of an existing block of stock. Surely this would be the result if the intention in diluting the existing shareholders' voting power was to preserve the existing board in office.").

[57] 564 A.2d 651 (Del. Ch. 1988).

[58] 813 A.2d 1118 (Del. 2003).

[59] 493 A.2d 946 (Del. 1985).

[60] *Liquid Audio*, 813 A.2d at 1132.

the primary purpose of interfering with or impeding the effectiveness of the stockholder vote in a contested election for directors."[61]

Delaware courts will also closely scrutinize transactions that impede a stockholder's exercise of a statutory right relating to the election of directors. In *Phillips v. Insituform of North America, Inc.*,[62] the Class B stockholders sought to enjoin a merger because the board issued new stock to deprive a receiver of the ability to act by written consent to replace the board. The court concluded that, when the corporation acts "solely or primarily for the express purpose" to deprive a stockholder of "effective enjoyment of a right conferred by law," "the board [must] demonstrate that the action taken was fair or justified given the particular business purpose sought to be achieved and the circumstances of the firm."[63]

In the Court of Chancery and this Court, Coster framed the dispute as one calling for *Schnell/Blasius* review. Coster alleged that an interested board approved the Stock Sale intending to interfere with her voting rights as a 50% stockholder and to entrench themselves in office by thwarting the Custodian Action. If that is the case, under *Schnell*, the court need not go any further to find a breach of fiduciary

---

[61] *Id.* (finding invalid a bylaw adopted "for the primary purpose of impeding and interfering with the efforts of the stockholders' power to effectively exercise their voting rights in a contested election for directors").

[62] 1987 WL 16285 (Del. Ch. Aug. 27, 1987).

[63] *Id.* at *6.

duty.[64]  And under *Blasius,* even if the court finds that the board acted in good faith when it approved the Stock Sale, if it approved the sale for the primary purpose of interfering with Coster's statutory or voting rights, the Stock Sale will survive judicial scrutiny only if the board can demonstrate a compelling justification for the sale.[65]  That the court found the Stock Sale was at an entirely fair price did not substitute for further equitable review when Coster alleged that an interested board approved the Stock Sale to interfere with her voting rights and leverage as an equal stockholder.[66]

---

[64] *See Blasius*, 564 A.2d at 658 (finding that if it were shown to be "factually true" that board actions "were pretexts for entrenchment for selfish reasons" then "one would not need to inquire further" because such an action "would constitute a breach of duty").  In *Blasius*, the Chancellor found that "even if [the board] *is* acting with subjective good faith" the court still had to decide whether the board "may validly act for the principal purpose of preventing the shareholders from electing a majority of new directors."  *Id.* (emphasis in original). It was not a question "of intentional wrong (or even negligence), but one of authority *as between the fiduciary and the beneficiary* (not simply legal authority, *i.e.*, as between the fiduciary and the world at large).").  *Id.* at 658–59 (emphasis in original).

[65] *Peerless*, 2000 WL 1805376, at *8 ("Under [*Blasius*], first the plaintiff must establish that the board acted for the primary purpose of thwarting the exercise of a shareholder vote.  Second, the board has the burden to demonstrate a compelling justification for its actions.  Under this second prong, even where the Court finds that the action taken by the board was made in good faith, it may still constitute a violation of the duty of loyalty.").

[66] Although Coster relied on this Court's decision in *Liquid Audio*, she did not argue that a *Unocal* analysis should follow after review under *Blasius*.  Thus, we will not consider the impact of *Unocal* review on this case.  We also decide this appeal on how the parties have framed it—a *Schnell/Blasius* review.  Further, the parties have not asked us to revisit how *Schnell/Blasius* and *Unocal* should fit together in future cases.

24

B.

On appeal we believe the following undisputed facts or facts found by the court support the conclusion, under *Schnell*, that the UIP board approved the Stock Sale for inequitable reasons:

- The Stock Sale occurred while buyout negotiations stalled between UIP's two equal stockholders;

- The stockholders could not elect a new board because of the deadlock, which led to the Custodian Action;

- A majority of the board members approving the sale were interested in the Stock Sale;

- Schwat and Bonnell were friends and "from the inception of Wout's transition planning negotiation, Schwat and Bonnell appeared to be aligned in negotiations against Wout;"[67]

- Schwat and Bonnell "worked together to develop the plan to moot the Custodian Action and neutralize the threat of [Coster] controlling the Company;"[68]

- The defendants were "in a rush for the [McLean] [V]aluation"[69] until the defendants "determined to answer the [plaintiff's] complaint and then subsequently amend the answer after the sale of stock to Bonnell was completed[,]"[70] which permitted them to "file[] an amended answer, which stated an intention to move for judgment on the pleadings because the Custodian Action had been mooted by the Stock Sale;"[71]

- The Stock Sale put UIP stock in the hands of fellow board member Bonnell, who was aligned with the holdover board;

[67] *Coster*, 2020 WL 429906, at *16.
[68] *Id.*
[69] *Id.* at *10.
[70] *Id.*
[71] *Id.* at *11.

25

- The Stock Sale entrenched the existing board in control of UIP; and

- "Defendants obviously desired to eliminate Plaintiff's ability to block stockholder action, including the election of directors, and the leverage that accompanied those rights."[72]

We recognize, however, that the court made other findings inconsistent with this conclusion.[73] Given our deferential standard of review on appeal for the Court of Chancery's factual findings, the court should have an opportunity to review all of its factual findings in any manner it sees fit in light of its new focus on a *Schnell/Blasius* review.

## III.

The judgment of the Court of Chancery is reversed, and the case is remanded for further proceedings. Jurisdiction is not retained. We note that, if the Court of Chancery on remand considers appointment of a custodian, under 8 *Del. C.* § 226(a)(1) the court "may"—not "must"—appoint a custodian when deadlock occurs.[74] The court will have to consider several factors, including whether on a

---

[72] *Id.* at *12.

[73] Coster "did not succeed in proving her theories regarding Defendants' purposes or justifications;" "Schwat testified and Bonnell corroborated that the appointment of a custodian constituted an event of default under various SPE contracts;" "the appointment of a custodian threatened to cut off a substantial amount of UIP's revenue streams;" "Schwat and Cox testified that, as much as anything, the Stock Sale was motivated by their desire to keep their promise to Bonnell;" and "Bonnell was viewed as essential to the Company's survival." *Id.*

[74] 8 *Del. C.* § 226(a) ("The Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians . . . ."); *see Shawe v. Elting*, 157 A.3d 152, 166 (Del. 2017) ("[T]he remedy to address the deadlock is ultimately within the Court of Chancery's discretion."); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del. 2002) ("This

more complete record the appointment of a custodian will breach agreements or otherwise harm the corporation.[75]

---

Court reviews the Court of Chancery's fashioning of remedies for abuse of discretion."); *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 281 (Del. 1995) ("[T]he appointment of a custodian is discretionary under [8 *Del. C.*] § 226(a)(1).") (alteration in original) (citation omitted).

[75] *See Miller v. Miller*, 2009 WL 554920, at *5 n.19 (Del. Ch. Feb. 17, 2009) (recognizing that "[d]eadlock, itself, is not an injustice" but "remedying [a]n 'injustice' informs the Court's discretion"). The court on remand can review the agreements in question, the default provisions, and decide whether the appointment of a custodian would be an event of default under those agreements.