# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARION COSTER, | § | |
| | § | No. 163, 2022 |
| Plaintiff Below, | § | |
| Appellant, | § | |
| | § | |
| | § | Court Below: Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| UIP COMPANIES, INC., | § | C.A. No. 2018-0440 |
| STEVEN SCHWAT, and | § | CONSOLIDATED |
| SCHWAT REALTY, LLC, | § | |
| | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: March 29, 2023
Decided: June 28, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, Justices; and **ADAMS**, Judge,[1] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery of the State of Delaware: **AFFIRMED**.

Max B. Walton, Esquire (*argued*), Kyle Evans Gay, Esquire, CONNOLLY GALLAGHER LLP, Newark, Delaware; Michael K. Ross, Esquire, Serine Consolino, Esquire, AEGIS LAW GROUP LLP, Washington, D.C., *for Plaintiff Below, Appellant Marion Coster.*

Deborah B. Baum, Esquire (*argued*), PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C.; Stephen B. Brauerman, Esquire, Elizabeth A. Powers, Esquire, BAYARD, P.A., Wilmington, Delaware, *for Defendants Below, Appellees Steven Schwat, Schwat Realty, LLC, Peter Bonnell, Bonnell Realty, LLC, and Steven Cox.*

---

[1] Justice Vaughn and Judge Adams are sitting by designation under Del. Const. art. IV, §§ 38 & 12, respectively, and Supreme Court Rules 2(a) and 4(a), to complete the quorum.

Neal C. Belgam, Esquire, Kelly A. Green, Esquire, Jason Z. Miller, Esquire, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *for Defendants Below, Appellee UIP Companies, Inc*.

**SEITZ**, Chief Justice:

This appeal returns to the Supreme Court following remand. As the Court of Chancery recognized in its latest opinion, "[m]any aspects of the facts of this case were vexingly complicated or unique" and "the case gave rise to many close calls on which reasonable minds could differ."[2] We agree with the court's assessment and appreciate its work to address the issues remanded for reconsideration. We also agree with the court's observation that the dispute has been driven by hard feelings on both sides – the untimely death of Marion Coster's husband, Wout Coster, who could not secure his wife's financial security before his death, and the UIP board's desire to preserve UIP's operational viability after the loss of one of its major stockholders and founding members.

As described in our first opinion and in the Court of Chancery opinions, Marion Coster and Steven Schwat – the two UIP stockholders who each owned fifty percent of the company – deadlocked after attempting several times to elect directors. In response to the director election deadlock, Marion Coster filed a petition for appointment of a custodian for UIP. The UIP board responded by issuing stock to a long-time employee representing a one-third interest in UIP. The stock issuance diluted Coster's ownership interest, broke the deadlock, and mooted the

---

[2] *Coster v. UIP Cos., Inc.*, 2022 WL 1299127, at *14 (Del. Ch. May 2, 2022) [hereinafter *Coster II*].

3

custodian action. Coster countered by requesting that the Court of Chancery cancel the stock issuance.

After trial, the Court of Chancery found that the stock sale met the most exacting standard of judicial review under Delaware law – entire fairness. As a result, according to the court, review under any other standard was unnecessary. On appeal, we concluded that the court erred by evaluating the stock sale solely under the entire fairness standard of review. We reasoned that, even though the stock sale price might have been entirely fair, issuing stock while a contested board election was taking place interfered with Coster's voting rights as a half owner of UIP. Therefore, the court needed to conduct a further review to assess whether the board approved the stock issuance for inequitable reasons. If not, the court still had to decide whether the board, even if it acted in good faith, approved the stock sale to thwart Coster's leverage to vote against the board's director nominees and to moot the custodian action. To uphold the stock issuance under those circumstances, the board had to demonstrate a compelling justification to interfere with Coster's voting rights.

On remand, the Court of Chancery found that the UIP board had not acted for inequitable purposes and had compelling justifications for the dilutive stock issuance. Among the justifications for the stock sale was the threat that a custodian

4

would pose to UIP due to termination provisions in many of its key contracts. It also cemented UIP's relationship with an employee critical to the success of the business.

In this second appeal after remand, Coster makes two primary arguments – first, the Court of Chancery misinterpreted *Schnell*[3] when it restricted its review for inequitable conduct to "the limited scenario wherein the directors have no good faith basis" for board action;[4] and second, the court erred when it found that the board had a compelling justification for the stock issuance. As explained below, the Court of Chancery did not err as a legal matter, and its factual findings are not clearly wrong. Thus, we affirm the Court of Chancery's remand decision.

I.

To recap the events leading to this appeal, UIP Companies, Inc. is a real estate services company founded in 2007 by Steven Schwat, Cornelius Bruggen, and Wout

---

[3] For those unfamiliar with the Delaware cases referred to in the opinion that now have shorthand references, *Schnell* refers to *Schnell v. Chris Craft Industries, Inc.* 285 A.2d 437, 439 (Del. 1971), where Justice Herrmann famously wrote that "inequitable action does not become permissible simply because it is legally possible" and management cannot inequitably manipulate corporate machinery to perpetuate itself in office and disenfranchise the stockholders. *Blasius* refers to *Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651, 659–61 (Del. 1988), where Chancellor Allen wrote that directors who interfere with board elections, even if in good faith, must have a compelling justification for their actions. And *Unocal* refers to *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985), where the Supreme Court used an enhanced standard of review to decide whether the directors "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed" and that the board's response "was reasonable in relation to the threat posed."

[4] *Coster II*, at *9.

5

Coster ("Wout").[5]  The company operates through various subsidiaries that provide a range of services to investment properties in the Washington, D.C. area.  Many of these properties are held in special purpose entities ("SPEs") that UIP owns alongside third-party investors.

Each of the three founders initially controlled a third of UIP's shares.  In 2011, Bruggen left UIP and tendered his shares to the Company at no cost.  This left Schwat and Wout as half owners of UIP.

In 2013, Wout notified Schwat and Peter Bonnell, a senior UIP executive, that he had been diagnosed with leukemia.  Shortly after, the group began negotiations for a buyout in which Bonnell and Heath Wilkinson, another UIP executive, would purchase Wout's shares in the company.  Bonnell had previously been promised equity in UIP on multiple occasions.  As the prospect for promotion had stalled, Bonnell and Wilkinson had both considered leaving UIP.  Therefore, beyond providing Wout with an exit, the buyout was also useful in incentivizing Bonnell and Wilkinson to stay.

Unfortunately, negotiations were unsuccessful. While the parties agreed on a non-binding term sheet in April 2014 in which Wout would receive $2,125,000 for

---

[5] Unless otherwise stated, the facts are drawn from the Court of Chancery's January 28, 2020 opinion, *Coster v. UIP Cos., Inc.*, 2020 WL 429906, at \*1 (Del. Ch. Jan. 28, 2020), *rev'd*, 255 A.3d 952 (Del. 2021) [hereinafter *Coster I*].

6

his half of UIP shares, the parties continued to go back and forth over the deal terms.[6]

Wout did not feel comfortable with the terms so "[n]o deal was ever finalized."[7]

Wout passed away on April 8, 2015, and his widow, Marion Coster ("Coster"), inherited his UIP interests.

Immediately after Wout's death, Schwat and Bonnell continued exploring buyout options with Coster. Discussions continued throughout 2015 with no resolution. During this time, Coster became "very distressed about her financial situation" as she had not received income distributions or the benefits she had expected.[8] By May 2016, "Coster appeared primarily interested in a lump sum buyout or arrangement that would provide her with a consistent stream of income."[9]

A July 2016 email reveals three "divorce" options that Bonnell had identified for Coster.[10] These included a lump sum buyout, an installment buyout, and a distribution scheme.[11] Seeking more information on these options and the status of any current outstanding distributions, Mike Pace, a friend of Wout and one of Coster's lawyers, reached out to Bonnell regarding the profitability of the UIP

---

[6] *See Coster I*, at *3. While it would be revised later, this initial valuation valued the company at $4,250,000. *See id.* at *4.
[7] *Id.* at *5.
[8] App. to Opening Br. at A77; *Coster v. UIP Cos., Inc.*, 255 A.3d 952 (Del. 2021) [hereinafter *Coster Appellate Decision*].
[9] *Coster Appellate Decision*, at 955.
[10] App. to Answering Br. at B34.
[11] *See id.* at B34–35.

operating companies.[12]   Bonnell responded that the "companies operate close to even" and that Schwat also "ha[d] not taken any distributions . . . after Wout's passing" since "there [had not] been much positive revenue generated."[13]   As the Court of Chancery noted, "Pace did not believe that Bonnell was forthcoming about the operating companies' true profitability."[14]   Negotiations between the parties continued throughout 2016 and into 2017 as Coster sought an independent valuation of UIP.

## A.

In August 2017, Coster provided UIP with a $7.3 million valuation and demanded to inspect UIP books and records.  Coster followed up with a second inspection demand in October 2017.  Then, "[a]fter much back and forth about the adequacy of the documents provided, on April 4, 2018, Coster called for a UIP stockholders special meeting to elect new board members."[15]   At this time, UIP had a five-member board composed of Schwat, Bonnell, and Stephen Cox, UIP's Chief

---

[12] *See* App. to Opening Br. at A79 ("You had indicated you would be forwarding the list of the remaining 'Wout projects' along with the target cash-out date and the expected cash-out amount. (We all recognize that such projections are just that and normal business risks could modify both the pay-out and the date.)"); *id.* at A76 ("From what you say, revenue from these companies has been sufficient to cover salaries, including, when [Wout] was fully involved, about $250,000/ year to Wout.  How has this 'Wout salary money' been spent since he's been gone?  Wouldn't this excess be available for distribution to the two owners?").

[13] *Id.* at A77.

[14] *Coster I*, at *6.

[15] *Coster Appellate Decision*, at 956.

8

Financial Officer. Two seats were vacant due to Wout's passing and Cornelius Bruggen's departure in 2011.

The stockholder meeting took place on May 22, 2018. Coster, represented by counsel, raised multiple motions affecting the size and composition of the board. Predictably, each of Coster's motions failed due to Schwat's opposition. Later that day, the UIP board reduced the number of board seats to three through unanimous written consent.

A second stockholder meeting followed on June 4, 2018. The meeting also ended in deadlock as Schwat and Coster each opposed the other's respective motions. With the deadlock, Schwat, Bonnell, and Cox remained UIP's directors.

B.

Coster filed a complaint in the Court of Chancery seeking appointment of a custodian under 8 *Del. C.* § 226(a)(1) (the "Custodian Action").[16] Coster's "complaint mainly sought to impose a neutral tie-breaker to facilitate director elections, but it also lodged allegations against Schwat" about the lack of

---

[16] 8 *Del. C.* § 226 allows for the Court of Chancery to appoint a custodian "upon application of any stockholder . . . when . . . [a]t any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors."

distributions and transparency into the company's affairs.[17] Coster "sought the appointment of a custodian with broad oversight and managerial powers."[18]

Coster's request for a "broadly empowered" custodian rather than one specifically tailored to target the stockholder deadlock "posed new risks to the Company."[19] As the Court of Chancery would later find, "[t]he appointment of a custodian with these powers would have given rise to broad termination rights in SPE contracts and threatened UIP's revenue stream, as UIP's business model is dependent on the continued viability of those contracts."[20] "Facing this threat to the Company," the UIP board decided to "issue the equity that they had long promised to Bonnell."[21] Having conducted its own valuation that "valued a 100-percent, noncontrolling equity interest in UIP at $123,869," the UIP board offered, and Bonnell purchased, a one-third interest in the company for $41,289.67 (the "Stock Sale").[22]

---

[17] *Coster I*, at *10; *see* App. to Opening Br. at A94 ("[D]espite the apparent success of the Company in recent years, [Coster] has been denied any distributions from the Company since 2015, the year her husband, a founder, died. Over the same period, Mrs. Coster believes the current Chairman of the Board and President of the Company, Defendant Steven Schwat, has received a generous salary from the Company and is enjoying significant benefit from his 50% stake. Mr. Schwat has further prevented Mrs. Coster from gaining a meaningful view into the Company's financial affairs, and has barred her from any representation on the Board.").

[18] *Coster I*, at *10.

[19] *Coster II*, at *4.

[20] *Id.*

[21] *Id.* at *5.

[22] *Coster Appellate Decision*, at 957.

The Stock Sale diluted Coster's ownership interest from one half to one third and negated her ability to block stockholder action as a half owner of the company. The Stock Sale also mooted the Custodian Action. Coster responded by filing suit and sought to cancel the Stock Sale.

C.

In its opinion following trial, the Court of Chancery upheld the Stock Sale under the entire fairness standard of review.[23] According to the court, once the Stock Sale "satisfie[d] Delaware's most onerous standard of review," no further review was required.[24] The deadlock broken, the court did not need to consider appointing a custodian and dismissed the action.

D.

In the first appeal, this Court did not disturb the Court of Chancery's entire fairness decision but remanded with instructions to review the Stock Sale under *Schnell* and *Blasius*. As explained in our first decision, while entire fairness is "Delaware's most onerous standard of review," it is "not [a] substitute for further equitable review" under *Schnell* or *Blasius* when the board interferes with director elections*:*

> In a vacuum, it might be that the price at which the board agreed to sell the one-third UIP equity interest to Bonnell was entirely fair, as was the process to set the price for the stock. But "inequitable action does not

---

[23] *Coster I*, at *12.
[24] *Id.* at *14.

11

become permissible simply because it is legally possible." If the board approved the Stock Sale for inequitable reasons, the Court of Chancery should have cancelled the Stock Sale. And if the board, acting in good faith, approved the Stock Sale for the "primary purpose of thwarting" Coster's vote to elect directors or reduce her leverage as an equal stockholder, it must "demonstrat[e] a compelling justification for such action" to withstand judicial scrutiny.

After remand, if the court decides that the board acted for inequitable purposes or in good faith but for the primary purpose of disenfranchisement without a compelling justification, it should cancel the Stock Sale and decide whether a custodian should be appointed for UIP.[25]

In the first appellate decision, we recounted the "undisputed facts or facts found by the court" that could "support the conclusion, under *Schnell*, that the UIP board approved the Stock Sale for inequitable reasons."[26] Those facts included that "[t]he Stock Sale occurred while buyout negotiations stalled between UIP's two equal stockholders," that "[t]he Stock Sale entrenched the existing board in control of UIP," and the Court of Chancery's finding that "Defendants obviously desired to eliminate Plaintiff's ability to block stockholder action, including the election of directors, and the leverage that accompanied those rights."[27] We recognized, however, "that the [Court of Chancery] made other findings inconsistent with this conclusion," and therefore gave the Court of Chancery the "opportunity to review

---

[25] *Id.* at 953–54 (quoting *Schnell*, 285 A.2d at 439 then quoting *Blasius*, 564 A.2d at 661–62).
[26] *Id.* at 963–64.
[27] *Id.* (quoting *Coster I*, at \*12).

all of its factual findings in any manner it sees fit in light of its new focus on *Schnell/Blasius* review."[28]

E.

On remand, the Court of Chancery found that the UIP board had not acted for inequitable purposes under *Schnell* and had compelling justifications for the Stock Sale under *Blasius*. For Coster's *Schnell* claim, the court held that "the UIP board had multiple reasons for approving the Stock Sale" and that "the UIP board's decision did not totally lack a good faith basis."[29] The court also found that the UIP board was primarily motivated by "retaining and rewarding Bonnell, mooting the Custodian Action, and undermining [Coster's] leverage."[30]

Turning to *Blasius* review, the court concluded that "[i]n the exceptionally unique circumstances of this case, Defendants have met the onerous burden of demonstrating a compelling justification."[31] The court's compelling justification analysis largely borrowed from *Unocal*'s reasonableness and proportionality test for defensive measures adopted by a board in response to a takeover threat.[32] As the court explained:

> To satisfy the compelling justification standard, "the directors must show that their actions were reasonable in relation to their legitimate

---

[28] *Id.* at 964.
[29] *Coster II*, at *10.
[30] *Id.*
[31] *Id.* at *12.
[32] *Unocal*, 493 A.2d at 955.

objective, and did not preclude the stockholders from exercising their right to vote or coerce them into voting a particular way." "In this context, the shift from 'reasonable' to 'compelling' requires that the directors establish a closer fit between means and ends."[33]

The court found that the threat posed by the Custodian Action was "an existential crisis" that justified the UIP board's actions and "that the Stock Sale was appropriately tailored to achieve the goal of mooting the Custodian Action while also achieving other important goals, such as implementing the succession plan that Wout favored and rewarding Bonnell."[34]

## II.

In her second appeal, Coster has challenged the Court of Chancery's ruling on both remand questions. This Court reviews the Court of Chancery's legal conclusions *de novo* but defers to the Court of Chancery's factual findings supported by the record.[35] We will set aside a trial court's factual findings only if "they are clearly wrong and the doing of justice requires their overturn."[36] "When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[37]

---

[33] *Coster II*, at *11 (quoting *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810–11 (Del. Ch. 2007) then quoting *Pell v. Kill*, 135 A.3d 764, 787 (Del. Ch. 2016)).
[34] *Id.* at *12–13.
[35] *See Backer v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 94 (Del. 2021).
[36] *Id.* at 95 (quoting *DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chi.*, 75 A.3d 101, 108 (Del. 2013)).
[37] *Id.* (quoting *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015)).

14

## A.

In her lead argument on appeal, Coster argues that the Court of Chancery erred when it limited its *Schnell* review to board action totally lacking a good faith basis. To frame our analysis, it is helpful to review again the circumstances of *Schnell* and *Blasius*. Both cases involved board action that interfered with director elections in contests for control – *Schnell*, a proxy solicitation, and *Blasius*, a consent solicitation.

In *Schnell*, the incumbent Chris-Craft board faced the prospect of a difficult proxy fight to retain their seats.[38] In response to the threat to their tenure as board members, the board accelerated the annual meeting date and moved the meeting to a more remote location. The director defendants mounted no real defense to the Court of Chancery suit except to argue that their actions did not violate the Delaware General Corporation Law ("DGCL") or Chris-Craft's bylaws and were therefore legal.

The Court of Chancery was persuaded by the board's legal authorization defense and dismissed the case. On appeal, the Supreme Court took a dim view of the board's intentional efforts to obstruct the insurgent's proxy contest. As the Court held, even though the board's actions met all legal requirements, the Chris-Craft board was "attempt[ing] to utilize the corporate machinery and the Delaware Law

---

[38] 285 A.2d at 439.

for the purpose of perpetuating itself in office; and, to that [sic] end, for the purpose of obstructing legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management."[39]  In Justice Herrmann's oft-quoted words, "inequitable action does not become permissible simply because it is legally possible."[40]  The Supreme Court ordered the Chris-Craft board to reinstate the original meeting date.

In *Blasius*, the Court of Chancery explored how *Schnell* operates in contested election cases, and specifically how *Schnell* was not the end of the road for judicial review of good faith board actions that interfered with director elections.[41]  Like *Schnell*, *Blasius* involved an incumbent board facing a consent solicitation aimed at replacing a majority of the board.  Atlas Industries had a staggered board.  Only seven of the authorized fifteen board seats were occupied.  With a majority of stockholders behind the effort, an insurgent could in one action amend the company's bylaws, increase the board size to fifteen, and elect a new board majority of eight members.

If the Atlas board had acted on a clear day to establish new seats and to fill the vacancies, the circumstances would have been different.  But for the Atlas board, the skies were cloudy, and it was raining.  It faced a serious consent solicitation.  In

---

[39] *Id*. at 439.
[40] *Id.*
[41] *Blasius*, 564 A.2d at 658.

response, the board added two seats and filled the newly created positions with directors friendly to management. Now, Blasius had to win not one, but two elections to control the board.

Two other points were important to the court's decision. First, Blasius enticed stockholders to vote for its nominees with a business plan that would give stockholders upfront cash and a later debenture redemption, all premised on a highly leveraged and speculative business strategy. And second, the Atlas board had its own turn-around strategy that it believed in good faith was a better choice for Atlas stockholders than Blasius' risky plan that could lead to Atlas' bankruptcy.

Blasius argued that the board's corporate maneuvers were "a selfishly motivated effort to protect the incumbent board from a perceived threat to its control of Atlas."[42] The Chancellor turned to *Schnell* to evaluate this claim. According to the court, if the board was not "principally motivated" to interfere with the consent solicitation and instead "had taken action completely independently of the consent solicitation, which merely had an incidental impact upon the possible effectuation of any action authorized by the shareholders, it is very unlikely that such action would be subject to judicial nullification."[43] On the other hand, if "there was no policy dispute or issue that really motivated this action" or "policy differences were

---

[42] *Id.* at 657.
[43] *Id.* at 655.

pretexts for entrenchment for selfish reasons," then the court "would not need to inquire further."[44] The Atlas board's actions "would constitute a breach of duty."[45]

The Chancellor found that the Atlas board did not act out of a desire to entrench the existing board but out of a good faith belief that Blasius was an existential threat to Atlas and its stockholders. Thus, under *Schnell*, the Atlas board was not principally motivated to interfere with the election of directors for selfish reasons. But the court was still left with the fact that the Atlas board, even if well-intentioned, had nonetheless acted to thwart Blasius's consent solicitation. Thus, the "real question the case present[ed]" was whether a board, even if acting in good faith, "may validly act for the principal purpose of preventing the shareholders from electing a majority of new directors."[46]

To answer the ultimate question, the court had to answer another question – whether there should be a "*per se* rule that would strike down, in equity, any board action taken for the primary purpose of interfering with the effectiveness of a corporate vote."[47] A rigid rule had the advantage of "clarity and predictability."[48] The disadvantage of such a rule, the Chancellor noted, was that "it may sweep too broadly."[49] In two relatively recent cases at the time, the court had enjoined board

---

[44] *Id.* at 658.
[45] *Id.*
[46] *Id.*
[47] *Id.* at 661.
[48] *Id.*
[49] *Id.*

acts done for the primary purpose of impeding the exercise of stockholder voting power.[50]  In those cases, the court held that "the board bears the heavy burden of demonstrating a compelling justification for such action."[51]  Applying this standard instead of a *per se* invalidity rule, according to the Chancellor, was "somewhat more consistent with the recent *Unocal* case."[52]

Ultimately, Chancellor Allen concluded that, even if the board acted in good faith, it did not justify its interference with the stockholder franchise.  The court did not propose to "invalidat[e], in equity, every board action taken for the sole or primary purpose of thwarting a shareholder vote."[53]  But the board could not rely on the justification that it "knows better than do the shareholders what is in the corporation's best interest."[54]

## B.

In the years since the Supreme Court and the Court of Chancery decided these iconic cases, the courts deployed *Schnell* to police board action that, although technically legal, was motivated for selfish reasons to interfere with corporate

---

[50] *See Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del. Ch. 1987); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *8 (Del. Ch. Aug. 27, 1987).
[51] *Blasius*, 564, A.2d at 661.
[52] *Id.* at 662 (quoting *Phillips*, 1987 WL 16285, at *8).
[53] *Id.*
[54] *Id.* at 663; *see also Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1124 (Del. Ch. 1990) (rejecting "the notion that the prospect that the shareholders might vote differently than the board recommends can alone constitute any threat to a corporate interest").

elections and stockholder voting.[55]  It was reserved, however, for "those instances

that threaten the fabric of the law, or which by an improper manipulation of the law,

would deprive a person of a clear right."[56]  In other words, "[a]lmost all of the post-

[55] *See Backer*, 246 A.3d at 96 ("[E]ven if the Bäckers complied with the technical requirements under the Company's corporate governance documents, the board's actions were nonetheless invalid under equitable principles because the Bäckers affirmatively deceived Anderson to create a quorum."); *Full Value Partners, L.P. v. Swiss Helvetia Fund, Inc.*, 2018 WL 2748261, at *4 (Del. Ch. June 7, 2018) (finding claim based on *Schnell* that incumbent board unequally applied a qualification bylaw to shareholder nominees to be meritorious when filed for purposes of the corporate benefit doctrine); *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 79 (Del. Ch. 2008) (finding delay of vote count to allow more time for management slate to secure votes was inequitable); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1081 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005) (finding bylaw amendments implemented by controller to facilitate a favored transaction and neutralize board's opposition "were clearly adopted for an inequitable purpose and have an inequitable effect"); *Linton v. Everett*, 1997 WL 441189, at *10 (Del. Ch. July 31, 1997) ("[D]irectors' decision to provide only thirty days' notice, which would inevitably trigger the advance notice provision in a manner foreseeably adverse to any shareholders desiring to nominate an opposing slate, constituted an inequitable manipulation of the election process.  Accordingly, the election must be set aside and a new election ordered."); *WNH Invs., LLC v. Batzel*, 1995 WL 262248, at *8 (Del. Ch. Apr. 28, 1995) (ruling "that defendants' purported purpose for the dilutive issuance is a pretext and their true purpose was to defeat plaintiff's challenge to their control"); *Hubbard v. Hollywood Park Realty Enterprises, Inc.*, 1991 WL 3151, at *13 (Del. Ch. Jan. 14, 1991) (ordering waiver of an advance notice by-law to allow shareholders to nominate an opposing director slate in response to a material change in company policy instituted after nomination deadline); *Aprahamian*, 531 A.2d at 1208 (enjoining the incumbent board from further delaying the company's annual stockholders meeting given the timing, "on the eve of the meeting, upon learning that they might be turned out of office"); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906, 914 (Del. Ch. 1980) (holding that a 70-days' notice bylaw was inequitable in a situation where the board announced the annual meeting only 63 days before it was to occur, rendering compliance impossible).

[56] *Alabama By-Prod. Corp. v. Neal*, 588 A.2d 255, 258 n.1 (Del. 1991); *see also In re WeWork Litig.*, 250 A.3d 976, 996 (Del. Ch. 2020) ("[O]ur 'case law is indicative of a healthy inclination on the part of the judiciary to employ the *Schnell* principle of "legal but inequitable" only sparingly,' and typically does so only when 'inequitable conduct has occurred but is not plainly remediable under conventional fiduciary doctrines.'" (citation omitted)); *AB Value Partners, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *5 (Del. Ch. Dec. 16, 2014) (holding that "[p]laintiff must provide compelling facts indicating that enforcement of the [advance notice bylaw] is inequitable" to enjoin application of an otherwise valid bylaw through *Schnell*); *Accipiter Life Scis. Fund, L.P. v. Helfer*, 905 A.2d 115, 124-26 (Del. Ch. 2006) (finding *Schnell* inapplicable in case where directors "did not act with the specific intent to limit the stockholder's rights to nominate and elect a dissident slate"); *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 886 (Del. 2002)

20

*Schnell* decisions involved situations where boards of directors deliberately employed various legal strategies either to frustrate or completely disenfranchise a shareholder vote."[57] While the Supreme Court was a bit hyperbolic to say that only claims that tear the fabric of our law come within *Schnell*, the Chancellor was correct in this case to cabin *Schnell* and its equitable review to those cases where the board acts within its legal power, but is motivated for selfish reasons to interfere with the stockholder franchise.[58]

## C.

The Court of Chancery in this case also interpreted *Blasius* with a sensitivity to how, in practice, the Supreme Court and the Court of Chancery have effectively folded *Blasius* into *Unocal* review. As discussed earlier, Chancellor Allen in *Blasius*

---

(distinguishing the requirement to treat shareholders equitably under *Schnell* from an obligation to treat holders of fractional shares equally in a reverse stock split); *Williams v. Geier*, 671 A.2d 1368, 1384 (Del. 1996) (refusing to apply *Schnell* where a share recapitalization plan did not have entrenchment as "its sole or primary purpose"); *Stahl*, 579 A.2d at 1123 ("[T]he action of deferring this company's annual meeting where no meeting date has yet been set and no proxies even solicited does not impair or impede the effective exercise of the franchise to any extent.").

[57] *Stroud v. Grace,* 606 A.2d 75, 91 (Del. 1992).

[58] *See Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *15–17 (Del. Ch. Oct. 13, 2021) (explaining that factual circumstances drive application of *Schnell* and that plaintiffs' "materially deficient" nomination notices undermine evidence of inequitable conduct by incumbent board); *Strategic Inv. Opportunities LLC v. Lee Enterprises, Inc.*, 2022 WL 453607, at *18 (Del. Ch. Feb. 14, 2022) ("The directors enforced requirements that were long known to [plaintiff] and that could have been complied with had [plaintiff] not delayed. Those actions cannot constitute a breach of fiduciary duty and are far from the sort of inequitable conduct that would require this court to intervene."); *Saba Cap. Master Fund, Ltd. v. Blackrock Credit Allocation Income Tr.*, 2019 WL 2711281, at *7 (Del. Ch. June 27, 2019), *aff'd in part, rev'd in part*, 224 A.3d 964 (Del. 2020) ("Proof that Defendants acted with the primary purpose of thwarting Saba's nominees under *Blasius*, or otherwise acted inequitably under *Schnell*, requires more than merely laying out the timeline of Defendants' conduct and speculating about bad intent or purpose.").

21

was skeptical of the board's authority, even if acting in good faith, to protect the stockholders from themselves when it came to corporate elections. As Chancellor Allen noted, "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests. Generally, shareholders have only two protections against perceived inadequate business performance. They may sell their stock . . . or they may vote to replace incumbent board members."[59] Given the stakes involved, the court decided that the board's justifications must be subject to enhanced scrutiny.

Blasius first applied that enhanced review by requiring a board, even if acting in good faith, to demonstrate a "compelling justification" for interfering with the stockholder franchise. But another standard of review could also apply when the board interferes with the stockholder vote during a contest for control. In *Unocal Corporation v. Mesa Petroleum Company*, this Court noted the "omnipresent specter" that incumbent directors might take action to further their own interests or those of incumbent management "rather than those of the corporation and its shareholders."[60] When stockholders challenge a board's use of anti-takeover measures, the board must show (i) that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (ii) that the response

---

[59] *Blasius*, 564 A.2d at 659.
[60] 493 A.2d at 954.

was "reasonable in relation to the threat posed."[61]   A defensive measure is an unreasonable response in relation to the threat if it is either draconian – coercive or preclusive – or falls outside a range of reasonable responses.[62]

In *Stroud v. Grace*, our Court first recognized how both *Blasius* and *Unocal* review were called for in a proxy fight involving a tender offer:

> Board action interfering with the exercise of the franchise often arose during a hostile contest for control where an acquiror launched both a proxy fight and a tender offer.  Such action necessarily invoked both *Unocal* and *Blasius*.  We note that the two "tests" are not mutually exclusive because both recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise.
>
> . . . In certain circumstances, a court must recognize the special import of protecting the shareholders' franchise within *Unocal*'s requirement that any defensive measure be proportionate and "reasonable in relation to the threat posed."  A board's unilateral decision to adopt a defensive measure touching "upon issues of control" that purposefully disenfranchises its shareholders is strongly suspect under *Unocal*, and cannot be sustained without a "compelling justification."[63]

After *Stroud*, the Court of Chancery in *Chesapeake Corporation v. Shore* went a step further and suggested merging the two standards of review in contested election cases.[64]  A single standard of review was possible, according to the court,

---

[61] *Id.* at 955.
[62] *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1367 (Del. 1995).
[63] *Stroud*, 606 A.2d at 92 n.3 (internal citations omitted); *see also Unitrin*, 651 A.2d at 1379–80 (noting use of *Blasius* and *Unocal* in contests for corporate control).
[64] *Chesapeake Corp. v. Shore*, 771 A.2d 293, 323 (Del. Ch. 2000).

by "infus[ing] . . . *Unocal* analyses with the spirit animating *Blasius*."[65]   Stated differently, the court would apply *Unocal* "with a gimlet eye out for inequitably motivated electoral manipulation or for subjectively well-intended board action that has preclusive or coercive effects."[66]

In *MM Companies v. Liquid Audio, Inc.*, the Supreme Court took the formal step to incorporate *Blasius* "within *Unocal*."[67]   In *Liquid Audio*, MM had tried for some time to take control of Liquid Audio.   When it looked likely that MM's nominees would gain board seats at the annual meeting, the Liquid Audio board responded by expanding the board from five to seven members and filling the new seats.   With a staggered board, the board expansion defeated MM's ability to control the board following the annual meeting.

MM filed suit to enjoin the incumbent board's action.   To invalidate the board's expansion, the Supreme Court applied *Blasius* "within *Unocal*" as the standard of review:

> When the *primary purpose* of a board of directors' defensive measure is to interfere with or impede the effective exercise of the shareholder franchise in a contested election for directors, the board must first demonstrate a compelling justification for such action as a condition precedent to any judicial consideration of reasonableness and proportionately. . . . To invoke the *Blasius* compelling justification standard of review within an application of the *Unocal* standard of review, the defensive actions of the board only need to be taken for the

---

[65] *Id.*
[66] *Id.*
[67] *MM Cos. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1129 (Del. 2003).

primary purpose of interfering with or impeding the effectiveness of the stockholder vote in a contested election for directors.[68]

Even though the Supreme Court in *Liquid Audio* combined *Blasius* and *Unocal* review, it did not solve the practical problem of how to turn *Unocal*'s reasonableness review and *Blasius'* "primary purpose" and "compelling justification" elements into a useful standard of review. The *Blasius* "compelling justification" standard of review turned out to be unworkable in practice. Once the court required a compelling justification to justify the board's action, the outcome was, for the most part, preordained.[69] The Court of Chancery also skirted *Blasius* review by limiting the "primary purpose" requirement and redefining what it meant to be compelling.[70]

---

[68] *Id.* at 1132.

[69] *See Chesapeake*, 771 A.2d at 323 ("In reality, invocation of the *Blasius* standard of review usually signals that the court will invalidate the board action under examination. Failure to invoke *Blasius*, conversely, typically indicates that the board action survived (or will survive) review under *Unocal*."); William T. Allen et. al., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 BUS. LAW. 1287, 1314 (2001) ("[T]he post-*Blasius* decisions surfaced the reality that a sorting mechanism was needed to insulate from the severe 'compelling justification' test, situations where directors took direct action to influence the electoral process, but in a manner that was consistent with their legitimate authority. . . . The elements of the *Unocal/Unitrin* analysis therefore gave courts the tool to answer the predicate question to the application of *Blasius*—did the directors act with the primary purpose of disenfranchisement?").

[70] *See Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 602–03 (Del. Ch. 2006) ("[T]he court is convinced that the board's seemingly good faith decision to structure the . . . transaction as a bankruptcy sale does not trigger the exacting legal standard set forth in *Blasius*. . . . [T]he directors' decision to structure the transaction in the manner they did cannot be traced to any entrenchment motivation."); *Apple Computer, Inc. v. Exponential Tech., Inc.*, 1999 WL 39547, at *5 (Del. Ch. Jan. 21, 1999) ("[T]he patent sale for which a shareholder vote was allegedly required could not serve as an opportunity for entrenchment. . . . [A] board's unintentional failure to fulfill its supposed § 271 obligations, while perhaps constituting a breach of fiduciary duty, does not ordinarily trigger *Blasius* review."); *Kidsco Inc. v. Dinsmore*, 674 A.2d 483, 496 (Del. Ch.), *aff'd*

In *Mercier v. Inter-Tel (Del.)*, the Court of Chancery reflected on these practical problems with *Blasius* review and took a different approach to the standard of review. The minority stockholders in *Mercier* claimed that a special committee of independent directors breached its fiduciary duties by rescheduling stockholder special meeting to consider a proposed merger. The committee also set a new record date. Instead of applying *Schnell* and *Blasius* "within *Unocal*," the Court of Chancery turned to *Unocal* and its "reasonableness" review but applied it with greater sensitivity to the interests at stake because the "director action . . . could have the effect of influencing the outcome of corporate director elections or other stockholder votes having consequences for corporate control."[71]

According to the court, the committee bore the burden of proof under a modified *Unocal* review (1) to identify "a legitimate corporate objective" supporting its decision to move the special stockholders' meeting date and to change the record date; (2) "to show that their motivations were proper and not selfish;" and (3) to demonstrate that, even if not disloyal, "their actions were reasonable in relation to

---

*and remanded*, 670 A.2d 1338 (Del. 1995) ("[T]he board action—amending the by-law to give the board an additional 25 days to call a shareholder-initiated special meeting—was not enacted for the 'primary purpose' of impairing or impeding the effective exercise of the franchise, nor will the challenged board action have that effect."); *Stahl*, 579 A.2d at 1122 (refusing to find defendants acted for "primary purpose of impairing or impeding the . . . the corporate franchise" despite board changing annual meeting date "in response to the risk that the combination of the proposed Stahl proxy contest and tender offer would result in a change in board control and the sale of the company."); *Pell*, 135 A.3d at 787 (linking the requirement to demonstrate a compelling justification with demonstrating reasonableness).

[71] *Mercier*, 929 A.2d at 810.

their legitimate objective and did not preclude the stockholders from exercising their right to vote or coerce them into voting a particular way."[72]  If "for some reason, the fit between means and end is not reasonable, the directors would also come up short."[73]  The court decided that the board's action satisfied *Unocal* review because the board's meeting and record date changes (1) allowed additional time for stockholders to consider the proposed merger; (2) protected the financial best interests of the stockholders; and (3) was neither preclusive nor coercive as the stockholders would ultimately be free to vote as they desired.[74]  The court refused to enjoin the board from rescheduling the special meeting date.

As Chancellor Allen did in *Blasius*, the court in *Mercier* also rejected "[t]he notion that directors know better than the stockholders" who should run the company.[75]  The court explained that the "know better" defense, standing alone, "is no justification at all" for the board to interfere with a contest for corporate control.[76]  Finally, in another important observation, the court did not believe that a more muscular *Unocal* analysis should apply outside of corporate election interference

---

[72] *Id.*

[73] *Id.* at 811.  The court also found that, applying *Blasius* review, the board had demonstrated a compelling justification for its actions.  *See id.* at 813 ("Because it would be impossible and inappropriate for me to ignore the existence of *Liquid Audio* and other Delaware Supreme Court decisions continuing to refer to a compelling justification standard, . . . I conclude that the Inter–Tel Special Committee has demonstrated a compelling justification for its actions.").

[74] *See id.* at 788, 817–18.

[75] *Id.* at 811.

[76] *Id.*

claims or contests for control. In the court's view, outside this context, "more traditional tools are available to police self-dealing or improperly motivated director action."[77]

More recently, in *Pell v. Kill*, the Court of Chancery continued to apply a modified *Unocal* review when board action interferes with a corporate election or a stockholder's voting rights in contests for control.[78] The board in *Pell* was an eight-member staggered classified board. In advance of its annual meeting and a looming proxy fight, the incumbent board reduced from three to one the Class I director seats up for election, ensuring their continued control of the company through a three-to-two majority.

As in *Mercier*, the court examined the board's motivations, whether the board's action was reasonable in relation to a legitimate objective, and whether the board's action was preclusive or coercive.[79] The court required the board to have a compelling justification for its action and noted that "[i]n this context, the shift from 'reasonable' to 'compelling' requires that the directors establish a closer fit between

---

[77] *Id.*
[78] *See Pell*, 135 A.3d at 787.
[79] *See id.*

means and ends."[80] To do so required the court to scrutinize the directors' action "with a 'gimlet eye.'"[81]

The court focused on the preclusive effect of the board reduction, which guaranteed that the incumbent board would maintain control, and the lack of adequate justification for the change. On the latter point, the court explained that even if the board had not acted selfishly, it improperly instituted the plan so that it, "rather than the Company's stockholders, could determine who would serve on the Board."[82] The court did not accept the board's other justifications that the plan was meant to boost board efficiency and cut costs. The court enjoined the board reduction.[83]

And in *Strategic Investment Opportunities LLC v. Lee Enterprises*, the board rejected a slate of board nominees for noncompliance with Lee's advance notice bylaw. The court found that the nominations did not comply with the contractual requirements of the bylaw, but that further equitable review was required to ensure the nomination rejections were equitable.[84] As the nominations and advance notice bylaw implicated board action interfering with a corporate election or a

---

[80] *Id.*; *see also id.* ("Although linguistically reminiscent of the type of review given to suspect classifications under the federal constitution, the use of the word 'compelling' is not intended to signal that type of strict scrutiny.").

[81] *Id.* (quoting *Chesapeake*, 771 A.2d at 323).

[82] *Id.* at 790.

[83] *See id.* at 769.

[84] *Strategic Inv.*, 2022 WL 453607 at *14 ("Put simply, directors' inequitable acts towards stockholders do not become permissible because they are legally possible.").

stockholder's voting rights in contests for control, the court applied enhanced scrutiny. According to the court,

> [t]he enhanced scrutiny standard of review requires a context-specific application of the directors' duties of loyalty, good faith and care. Fundamentally, the standard to be applied is one of reasonableness. The defendants must "identify the proper corporate objectives served by their actions" and "justify their actions as reasonable in relation to those objectives." If the incumbent directors actions' "operate[d] as a reasonable limitation upon the shareholders' right to nominate candidates for director," they will generally be validated.[85]

"[W]hether labeled as *Unocal* or *Blasius*," the court reasoned that the "inquiry [would] be undertaken 'with a special sensitivity' where directors' actions may affect the stockholder franchise or the result of director elections."[86] The court then found that the Lee board had a "genuine interest in enforcing its Bylaws so that they retain meaning and clear standards" and did so "even handedly and in good faith" in a way that did not make "compliance difficult."[87] The board had not, therefore, acted inequitably.

## D.

In *Unocal*, the Supreme Court remarked that "our corporate law is not static."[88] Experience has shown that *Schnell* and *Blasius* review, as a matter of

---

[85] *Id.* at *16 (quoting *Mercier*, 929 A.2d at 810 then *Hubbard*, 1991 WL 3151, at *11).
[86] *Id.* at *15 (quoting *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 259 (Del. Ch. 2013)).
[87] *Id.* at *17–18.
[88] 493 A.2d at 957.

30

precedent and practice, have been and can be folded into *Unocal* review to accomplish the same ends – enhanced judicial scrutiny of board action that interferes with a corporate election or a stockholder's voting rights in contests for control.[89] When *Unocal* is applied in this context, it can "subsume[] the question of loyalty that pervades all fiduciary duty cases, which is whether the directors have acted for proper reasons" and "thus address[] issues of good faith such as were at stake in *Schnell*."[90] *Unocal* can also be applied with the sensitivity *Blasius* review brings to protect the fundamental interests at stake – the free exercise of the stockholder vote as an essential element of corporate democracy.[91]

As we explained in our earlier decision in this case, the court's review is situationally specific and is independent of other standards of review.[92] When a stockholder challenges board action that interferes with the election of directors or a stockholder vote in a contest for corporate control, the board bears the burden of proof. First, the court should review whether the board faced a threat "to an important corporate interest or to the achievement of a significant corporate

---

[89] *See* Lawrence A. Hamermesh et. al., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective and Look Ahead*, 77 BUS. LAW. 321, 331 (2022) [hereinafter *Hamermesh*] ("[*Unocal*] provides a functional way for courts to expose and invalidate pretextual behavior even where a subjective inequitable purpose cannot be clearly established.").

[90] *Mercier*, 929 A.2d at 807.

[91] *See Chesapeake*, 771 A.2d at 323; *Hamermesh*, at 330–31 (discussing benefits of "incorporat[ing] *Blasius*' and *Schnell*'s spirit into the *Unocal* test").

[92] *See Coster Appellate Decision*, at 960 (explaining that further equitable review under *Schnell* was necessary despite Court of Chancery's entire fairness review).

benefit."[93]  The threat must be real and not pretextual, and the board's motivations must be proper and not selfish or disloyal.  As Chancellor Allen stated long ago, the threat cannot be justified on the grounds that the board knows what is in the best interests of the stockholders.

Second, the court should review whether the board's response to the threat was reasonable in relation to the threat posed and was not preclusive or coercive to the stockholder franchise.  To guard against unwarranted interference with corporate elections or stockholder votes in contests for corporate control, a board that is properly motivated and has identified a legitimate threat must tailor its response to only what is necessary to counter the threat.  The board's response to the threat cannot deprive the stockholders of a vote or coerce the stockholders to vote a particular way.[94]

_____

[93] *See Phillips*, 1987 WL 16285, at *7; *Mercier*, 929 A.2d at 788 ("[D]irectors fearing that stockholders are about to make an unwise decision that poses the threat that the stockholders will irrevocably lose a unique opportunity to receive a premium for their shares have a compelling justification—the protection of their stockholders' financial best interests . . . ."); *In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 678 (Del. Ch. 2004) ("The Board clearly identified a threat—the possibility that a merger that the Board twice reasonably deemed to be in the best interests of the Company and its stockholders, and which was supported by a majority of stockholders who had voted, would fail to win approval, in large part due to a stale record date."); *Peerless*, 2000 WL 1805376, at *15 (abstaining from ruling on issue of compelling justification at summary judgment stage but noting that "justifications offered . . . collectively provide some hope or reasonable possibility for satisfying the onerous compelling justification burden."); *Stahl*, 579 A.2d at 1124 (justifying a delay to shareholder vote on the sale of company to allow for more time to gather information).

[94] *See Pell*, 135 A.3d at 793 ("By pre-ordaining the results of the Annual Meeting, the Board Reduction Plan deprives stockholders of their right to vote."); *compare Stahl*, 579 A.2d at 1123 (finding shareholder voting not precluded by postponement of shareholder meeting when proxies had not yet been collected and meeting date not fixed) *with Aprahamian*, 531 A.2d at 1208 (finding

Applying *Unocal* review in this case with sensitivity to the stockholder franchise is no stretch for our law. Here, the UIP board issued stock to break a director election deadlock and moot a custodian action. In *Phillips v. Insituform of North America, Inc.*, the Court of Chancery addressed a dilutive stock issuance designed to thwart a consent solicitation.[95] Chancellor Allen, applying *Unocal* review, recognized the extraordinary nature of the board's action and the important interests at stake when the board issues stock to counteract a looming stockholder vote:

> *Unocal* teaches that the powers of the board to deal with perceived threats to the corporation extend, in special circumstances, to threats posed by shareholders themselves and a board may, in such circumstances, take action to protect the corporation even if such action discriminates against and injures the shareholder or class of shareholders that poses a special threat. However, it is extraordinary for the law to sanction the act of a fiduciary directed against the interest of his *cestui que trust* and, in such a case, it is necessary for a reviewing court to be satisfied that, in all of the circumstances, the act taken was justified. The *Unocal* court used the phrase "reasonable in relationship to the threat posed."[96]

After reviewing two other cases that applied enhanced review to board action issuing stock to interfere with the stockholder franchise, the Court of Chancery in

---

postponement of shareholder meeting inequitable where postponement did not serve "any significant interests of the stockholders" and could have resulted in voiding of proxies and frustration of shareholder franchise); *see also Blasius*, 564 A.2d at 656 ("[T]he effect of adding two directors would be to preclude stockholders from effectively implementing the Blasius proposal.").

[95] *Phillips*, 1987 WL 16285.

[96] *Id.*, at *7.

*Phillips* concluded that "the record supplies scant grounds to suppose that an affirmative injury to the corporation was to be reasonably apprehended" and "no justification has been shown that would arguably make the extraordinary step of issuance of stock for the admitted purpose of impeding the exercise of stockholder rights reasonable in light of the corporate benefit, if any, sought to be obtained."[97] The court in *Phillips* prohibited the board's interference with the stockholder franchise.

E.

In our first decision, we highlighted facts in the Court of Chancery's first decision that might have led to the conclusion that the board acted for selfish reasons. But we recognized that the court had made findings inconsistent with this result and remanded to allow the Court of Chancery to reconsider its decision in light of our

---

[97] *Id.*, at *8 (discussing *Canada S. Oils, Ltd. v. Manabi Expl. Co.*, 96 A.2d 810, 813 (1953) then *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769, 777 (1967)); *see Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) ("Equity will protect a controlling stockholder against the dilution of its position when a board acts for an improper purpose, such as entrenchment, that is adverse to the interests of the entity and all of its stockholders, but a board otherwise does not have a duty to protect the controller. The board's fiduciary duty of loyalty compels the directors to act in the best interests of the entity and the stockholders as a whole, and a board acting loyally may take action to oppose, constrain, or even dilute a large or controlling stockholder."); *Mendel v. Carroll*, 651 A.2d 297, 304 (Del. Ch. 1994) ("Surely if the principal motivation for such dilution is simply to maintain corporate control ('entrenchment') it would violate the norm of loyalty. Where, however, a board of directors acts in good faith and on the reasonable belief that a controlling shareholder is abusing its power and is exploiting or threatening to exploit the vulnerability of minority shareholders, I suppose, for reasons touched upon in the cases cited in the margin, that the board might permissibly take such an action."); *Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *9 (Del. Ch. Oct. 16, 1987) (stating that, under *Unocal* review, "a board might be justified in issuing an option that would have the effect of diluting the voting power of an existing block.").

first opinion. On remand the court did as requested. The court found that there was "more to the story" than contained in its first opinion.[98] It supplemented the earlier factual findings with the following:

- "Without making any meaningful effort to negotiate board composition, Plaintiff filed a complaint in this Court seeking the appointment of a custodian;"[99]

- "Plaintiff's request for custodial relief was extremely broad. Plaintiff did not present a tailored request for relief that targeted the stockholder deadlock. Rather, she asked the court to empower a custodian to 'exercise full authority and control over the Company, its operations, and management;'"[100]

- "The threat of a court-appointed custodian so broadly empowered posed new risks to the Company. The appointment of a custodian with these powers would have given rise to broad termination rights in SPE contracts and threatened UIP's revenue stream, as UIP's business model is dependent on the continued viability of those contracts;"[101]

- "Facing this threat to the Company," the UIP board "identified a solution" to issue equity "long promised to Bonnell" that "implent[ed] a succession plan" proposed "on a clear day;"[102]

- The Stock Sale would "moot the Custodian Action and eliminate the risks the appointment of a custodian posed to UIP" and would "eliminate the stockholder leverage that Plaintiff was using to try to force a buyout at a price detrimental to the Company;"[103]

---

[98] *Coster II*, at *3.
[99] *Id.* at *4.
[100] *Id.*
[101] *Id.*
[102] *Id.* at *5.
[103] *Id.*

- The UIP board's motives were not "pretexts for entrenchment for selfish reasons" or "post-hoc justifications;"[104] and

- "[T]hese were genuine motivations for their actions that stood alongside the more problematic purposes that [*Coster I*] identified and the Appellate Decision collected."[105]

After its additional fact findings, the Court of Chancery gathered the many strands of precedent and conducted a careful review of the UIP board's actions. The Chancellor found that the UIP board faced a threat – which the court described as an "existential crisis" – to UIP's existence through a deadlocked stockholder vote and the risk of a custodian appointment. Although the court thought that some of the board's reasons for approving the Stock Sale were problematic, on balance the court held that the board was properly motivated in responding to the threat. According to the court, the UIP board acted in good faith "to advance the best interests of UIP" by "reward[ing] and retain[ing] an essential employee," "implement[ing] a succession plan that Wout had favored," and "moot[ing] the Custodian Action to avoid risk of default under key contracts."[106] The court also relied on its earlier finding that the UIP board issued UIP stock to Bonnell at an entirely fair price.[107]

The Court of Chancery also found that the UIP board responded reasonably and proportionately to the threat posed when it approved the Stock Sale and mooted

[104] *Id.* (quoting *Blasius*, 564 A.2d at 658 then quoting Pl.'s Post-Remand Opening Br. at 2).
[105] *Id.*
[106] *Id.* at *10.
[107] *Id.*

the Custodian Action. As it held, "in the exceptionally unique circumstances of this case," without the Stock Sale, the possibility that a custodian appointed with broad powers would jeopardize key contracts caused an existential crisis at UIP. The Stock Sale, the court held, "was appropriately tailored to achieve the goal of mooting the Custodian Action" while implementing the succession plan and retaining Bonnell.[108] And the court noted that there were more aggressive options that could have been, but were not, pursued to break the deadlock.[109]

Finally, the board's response to the existential threat posed by the stockholder deadlock and custodian action was not preclusive or coercive. Although the Stock Sale effectively foreclosed Coster from perpetuating the deadlock facing UIP, the new three-way ownership of the company presented a potentially more effective way for her to exercise actual control. As the Court of Chancery noted, Schwat and Bonnell are not bound to vote together, meaning Coster could cast a swing vote at stockholder meetings.[110] As an equal one third owner with the two other stockholders, Coster can join forces with either one of UIP's other owners "at some

---

[108] *Id.* at *11–12.

[109] *Id.* at *13 ("The UIP board could have chosen more aggressive means of breaking the deadlock that would have favored Schwat. They could have issued him an additional share, thereby giving him hard voting control. They could have issued Schwat options, claiming that it was part of his compensation. They could have created an employee stock option plan and empowered Schwat to vote those shares. . . . But the UIP board did not pursue a course that would enhance Schwat's authority. It implemented the succession plan that Wout had favored.").

[110] *See Coster II*, at *13 ("Bonnell could switch sides tomorrow and unite with Plaintiff to Schwat's detriment. The record reflects that Schwat and Bonnell have disagreed on a number of business decisions").

point in the future."[111]  A realistic path to control of UIP negates the preclusive impact of the Stock Sale.[112]

F.

Coster's remaining arguments on appeal pick at the court's factual findings without success.  As noted above, Coster has a steep hill to climb because we review those findings to see whether they are "clearly wrong."  First, the main thread running through several of her arguments is that, instead of diluting her equity, the UIP board could have made the same arguments about an existential crisis when it opposed the appointment of a custodian.  If the court declined to appoint a custodian,

---

[111] *Air Prod. & Chemicals, Inc. v. Airgas, Inc.*, 16 A.3d 48, 115 (Del. Ch. 2011).

[112] *See Pell*, 135 A.3d at 788 (finding the reduction of board seats had a preclusive impact as it made success in a proxy contest realistically unattainable through removing classified board seats that "prevented the stockholders from establishing a new majority"); *Yucaipa Am. All. Fund II, L.P. v. Riggio*, 1 A.3d 310, 354 (Del. Ch. 2010), *aff'd*, 15 A.3d 218 (Del. 2011) (finding defensive measures not preclusive as plaintiff could "succeed in a proxy contest if it puts together a platform and a slate of candidates that are attractive to" other major stockholders); *Versata Enterprises, Inc. v. Selectica, Inc.*, 5 A.3d 586, 601 (Del. 2010) ("[T]here is, analytically speaking, only one test of preclusivity: 'realistically unattainable.'"); *In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 483–84 (Del. Ch. 2000) (finding a supermajority provision that made it "very difficult to amend the corporation's bylaws and . . . other defenses without the support of [the] board" not preclusive as attaining the requisite shareholder vote was "theoretically achievable" and a newly elected board could itself amend the bylaws); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 49 (Del. Ch.), *aff'd sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998) (finding that a delayed redemption provision for a shareholder rights plan did not preclude outstanding sale of company as a hostile bidder could take control of board and enter into transaction structured to close after expiration of deferred redemption provision but invalidating provision on other grounds); *Unitrin*, 651 A.2d at 1383 ("Even a complete implementation of the Repurchase Program, in combination with the pre-existing Supermajority Vote provision, would not appear to have a preclusive effect upon American General's ability successfully to marshall enough shareholder votes to win a proxy contest.  A proper understanding of the record reflects that American General or any other 14.9% shareholder bidder could apparently win a proxy contest with a 90% turnout." (internal citations omitted)).

the argument goes, the Stock Sale would have been unnecessary to defeat the custodian action. Coster also claims that "there was nothing exigent about allowing Bonnell to buy equity in UIP" as there was no "evidence that Bonnell threatened to leave UIP if he did not receive equity."[113]

But the Chancellor found, under the unusual facts of this case, that it was the pendency of the Custodian Action itself that caused the existential crisis at UIP.[114] The Board was not required to risk court appointment of a custodian with broad powers that would trigger defaults under UIP's SPE contracts. The court also found that the Stock Sale fulfilled a prior equity commitment to Bonnell, which encouraged him, as a key employee, to remain with UIP. According to the court, Bonnell was "essential to the Company's survival."[115]

Coster also contests the relevance of the "broad termination rights" in UIP's various contracts. At trial, Bonnell testified that a "primary investor" in each SPE holds termination authority.[116] Coster contends that "many, if not most, of the third-party contracts relied upon by Defendants are contracts between UIP and SPEs

---

[113] Opening Br. at 35.
[114] *See Coster II*, at *12–13 ("To make Bonnell the swing vote, Schwat clearly believed that the Custodian Action was a threat to the Company and that Bonnell was vital to the Company.").
[115] *Coster I*, at *12.
[116] App. to Answering Br. at B208 ("[T]he primary investor, the large investor, the 90 or 80 percent partner, has broad authority to terminate those -- to terminate those agreements.").

owned and controlled by Schwat and Bonnell,"[117] who supposedly control the termination decision.

The record contains only excerpts of the UIP contracts. While these excerpts reveal superficial links between UIP and the SPEs, as would be expected of affiliated companies, the excerpts do not have provisions clearly placing termination rights in Schwat or Bonnell's control.[118] The record, therefore, does not unequivocally support Coster's contention. Bonnell also testified at trial that an independent primary investor in each SPE has the authority to terminate the contracts.[119] UIP also confirmed at oral argument that UIP representatives did not control the termination rights.[120]

---

[117] Opening Br. at 35. There is a link between Schwat and Bonnell and the SPEs given UIP valuation materials stating that "UIP Companies and its subsidiary primarily serve the realty businesses of its owners, as the majority of the Company's revenue (over 95%) *comes from SPEs that have Schwat Realty LLC and Coster Realty LLC as equity members*" and "UIP Companies and its subsidiaries primarily serve the realty businesses of its owners, as nearly all of the Company's revenue comes from *SPEs in which the owners are investors*." *Coster I*, at \*19 n.254 (quoting JX-67 at 7 then quoting JX-66 at 7) (emphasis added). The extent of control, however, remains unanswered as the record only contains excerpts of relevant contracts.

[118] In some instances, the contract excerpts show what may be UIP-affiliated companies on both sides of the agreements. *See, e.g.*, App. to Opening Br. at A233 (showing agreement "by and between UIP 3501 13th Street, NW LLC, a Delaware limited liability company . . . and UIP Property Management, Inc., a Maryland corporation"); *id.* at A240 (showing agreement "by and between UIP-NYCB FIVE, LP, a District of Columbia limited partnership . . . and UIP Asset Management, Inc, a Delaware corporation"); *id.* at A247 (showing agreement "by and between UIP 1841 Columbia Road, LLC, a Delaware limited liability company . . . and UIP Property Management, Inc., a Maryland corporation").

[119] *See* App. to Answering Br. at B208.

[120] Oral Argument at 19:48, *Coster v. UIP Companies, Inc., et al.*, No. 163, 2022 (Del. argued Mar. 29, 2023), https://livestream.com/delawaresupremecourt/events/10769099/videos/235612372 ("Important decisions like termination rights are reserved to the principal equity investor.").

Finally, Coster takes issue with two other aspects of the Court of Chancery's decision. First, she disagrees with how the court considered Wout's wishes for a succession plan benefiting Bonnell. The Court of Chancery concluded that Wout and Schwat had devised a succession plan to sell equity to Bonnell.[121] Coster claims that Wout's intentions before his passing were irrelevant to the dispute because "it is the current stockholders to whom a board owes a duty of loyalty."[122] The court did not, however, place undue weight on this fact. It was merely one in a constellation of other more compelling justifications for the Stock Sale.

Second, Coster contends that the court improperly considered her motivations for filing the Custodian Action. The court believed that Coster "wielded [her] rights to create leverage in buyout negotiations" and viewed the Custodian Action as contrary to Coster's interests.[123] According to Coster, this assessment in turn improperly influenced whether the UIP board had a compelling justification for the Stock Sale.[124] Coster's argument, however, exaggerates the role of these findings. The court did not rely directly on this observation in its analysis. What the court did find dispositive was the harm caused by the possibility of a custodian appointment

---

[121] *See Coster II*, at *13 ("But the UIP board did not pursue a course that would enhance Schwat's authority. It implemented the succession plan that Wout had favored.").
[122] Opening Br. at 38.
[123] *Coster II*, at *3.
[124] Opening Br. at 38–42 (arguing it was error to find that Coster had an improper motive for filing the Custodian Action).

41

– termination of the SPE contracts – that would not have been in either UIP's or Coster's best interests.[125]

III.

The judgment of the Court of Chancery is affirmed.

---

[125] *See Coster II*, at \*11 ("[T]he UIP board believed that the Custodian Action would cause defaults under the Company's key agreements and threaten the business. No one, including Plaintiff, would benefit from that outcome.").